COOK et ux, *Appellants,*
*v.*
SALISHAN PROPERTIES, INC., et al, *Respondents.*
(No. 398-143, SC 24621)
569 P2d 1033

Ridgway K. Foley, Jr., and Donald Joe Willis of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, argued the cause for appellants. With them on the briefs were John L. Schwabe, and Roland F. Banks, Jr., Portland.

Barnes H. Ellis, of Davies, Biggs, Strayer, Stoel & Boley, Portland, argued the cause for respondents. With him on the brief were Gregory R. Mowe, Portland; and Robert J. Miller of Black, Kendall, Tremaine, Boothe and Higgins, Portland.

Before Denecke, Chief Justice, and Holman, Howell, Bryson, Lent, Linde, and Tompkins,* Justices.

HOLMAN, J.

*Tompkins, J., did not participate in the decision of this case.

## HOLMAN, J.

This is an action for damages to recover the diminution in value of a seaside house and lot. Plaintiffs appeal from a judgment for defendants after a jury trial.

In *Yepsen v. Burgess,* 269 Or 635, 525 P2d 1019 (1974), we held that a warranty of workmanlike construction and fitness for habitation was implied in the sale of a new house by a builder-vendor. In *Yepsen* we said that the "more precise definition of the scope of this warranty must await delineation on a case by case basis." 269 Or at 641. The plaintiffs in the present case contend that a similar warranty of fitness for use should be implied as a matter of law in the long-term lease of a residential lot.

The lot in question is a part of Salishan Development on Salishan Spit and is located near Gleneden Beach in Lincoln County. The lease is for a term of 99 years, and is renewable for successive twenty-year periods.[1] Plaintiffs are the lessees and Salishan Properties, Inc., is the lessor.[2] As described in plaintiffs' complaint, Salishan Development is "an exclusive and prestigious seashore real estate development and resort." Plaintiffs' lot, like the others in the development, is limited by the terms of the lease to use for residential purposes only.

The complaint alleges that plaintiffs paid $14,950 for their leasehold and expended nearly $35,000 to build a permanent home on the lot and that since that

[1]The terms of the lease call for a substantial "primary rental" at the time of execution of the lease, and for additional monthly payments as "maintenance rental." Renewal of the lease after 99 years obligates the lessee to continue payment of the maintenance rental only. It was stated at oral argument that the reason for leasing rather than selling the homesites was to keep the roads in the development private.

[2]Defendants Gray and Colwell are officers of Salishan Properties. Plaintiffs' complaint discloses no grounds for independent warranty liability on the part of these defendants. We will, therefore, refer to Salishan Properties, Inc., as the defendant.

time their lot has been damaged by erosion and that its value has been reduced by the threat of future erosion.[3] The complaint further alleged:

> "Defendants, by the acts of holding themselves out as highly skilled and competent land and resort developers and offering and entering into these leases, impliedly warranted that these lots were reasonably fit for construction and the maintenance thereon of permanent residential structures. The lots were not reasonably fit for that purpose, and defendants therefore breached this warranty. The damage to plaintiffs * * * was proximately caused by the breach of said implied warranty."

Plaintiffs' warranty allegations were stricken from the complaint by the trial court, and plaintiffs assign that ruling as error.

By arguing that a warranty of fitness should be implied by law in a transaction of this kind, plaintiffs are asking that we impose on the developer a species of strict liability in addition to other available theories of liability. Besides their warranty count, these plaintiffs also alleged that defendants were negligent in failing to make adequate investigation of the land's fitness for residential construction and in failing to warn prospective purchasers of the danger of erosion and, further, that defendants made false representations as to the stability of the land. These allegations were submitted to the jury, which returned a verdict for defendants on these issues.

■ The issue on appeal, then, is whether a commercial seller or lessor who has not made false representations and who has not been negligent either in failing to discover defects in the land or in failing to warn

---

[3]The precise damage which plaintiffs suffered is not clear from the complaint because it was originally framed for a class action. Certification for a class action was not obtained, and that ruling is not before us. For purposes of this opinion we have assumed that plaintiffs have suffered the kinds of damage alleged to have been suffered by all members of the original class.

prospective purchasers of known defects will, nevertheless, be held liable if the land turns out to be unsuitable for the purposes for which it was sold or leased.

In *Yepsen* we noted and followed a trend in other jurisdictions toward the recognition of an implied warranty in the sale of new houses, and summarized the justifications for that recognition as follows:

"* * * These cases, reflecting a change in the morals of the market place, more specifically rest their holdings on the ground that the underlying theory of *caveat emptor,* predicating an arm's length transaction between seller and buyer of comparable skill and experience, is unrealistic as applied to the sale of new houses. The courts of this persuasion recognize that the essence of the transaction is an implicit engagement upon the part of the seller to transfer a house suitable for habitation. It is also recognized that the purchaser is not in an equal bargaining position with the builder-seller of a new house and is forced to rely upon the latter's skill and knowledge with respect to the ingredients of an adequately constructed dwelling house. It is further explained that, although a house becomes a part of the realty according to the technical law of accession, the purchaser sees the transaction primarily as the purchase of a house with the land only as an incident thereto. Looked at in this light, there is no substantial difference between the sale of a house and the sale of goods and it follows, therefore, that the implied warranties of fitness for use attendant upon a sale of personal property should attach to a sale of a house." 269 Or at 639-40.

These justifications, which we found persuasive in the aggregate in *Yepsen,* are of two types: a recognition of consumer expectation on the one hand and, on the other, an acknowledgment that buyers of houses, like buyers of other goods, must of necessity rely on the expertise of the builder or manufacturer. Both of these considerations have some application to the sale of land by a subdivider-developer. The question is whether the extent of that applicability is sufficient to justify the extension of warranty principles to the sale

or lease of developed but unimproved land.[4] We are of the opinion that it is not.

■ Purchasers of subdivided land from commercial developers undoubtedly are justified in expecting that land to have been chosen for development and laid out into lots with reasonable care and professional skill. We are, however, unaware of any general expectation on the part of such purchasers, or the public at large, that a land developer will provide a lot which is free of all defects, including those which could not reasonably have been discovered prior to the sale. Even those who hold themselves out as "highly skilled and competent" land developers, as is alleged of defendant in this case, are not, so far as we are aware, expected to guarantee that the land is without any flaws, even though undetectable, which might render it unfit for use in the future.

Moreover, while it is true that the ordinary purchaser of subdivided land relies, to a great extent, on the expertise of the developer, the degree of the purchaser's *necessary* reliance is not as great as that of the purchaser of a home. Land is accessible for inspection before it is purchased. Although we do not suggest that the prospective purchaser's opportunity to inspect, or the expertise which he or she brings to that inspection, is equal to that of the developer, nevertheless the situation is not comparable to that involving a completed house, where many of the crucial details, such as wiring and structural materials, are placed beyond the purchaser's power to inspect by the construction process itself.

■ The rationale of *Yepsen* does not, therefore, require that we recognize an implied warranty of fitness in the present case. And plaintiffs have not convinced us that

---

[4] From the terms of the lease (see note 1, *supra*) it appears that the parties intended, for practical purposes, a transfer of the property in perpetuity. We attach no significance, for purposes of this opinion, to the fact that a long-term lease rather than a sale is involved. We do not, however, intend that what is said in this opinion will necessarily apply to all landlord-tenant relationships.

[ 338 ]

purchasers of developed but unimproved land, as a class, need the additional protection of the application of warranty or strict liability principles.

The recent expansion of the strict liability of sellers of goods has come about in response to felt needs that were not being met by traditional legal theories.[5] This court, like most others, has participated in that expansion with the realization that prior doctrine and logic are not entirely adequate to support either the expansion itself or its appropriate limitations. The three opinions in *Redfield v. Mead, Johnson & Co.,* 266 Or 273, 512 P2d 776 (1973), and the five opinions in *Markle v. Mulholland's, Inc.,* 265 Or 259, 509 P2d 529 (1973), bear witness, as do a number of our other decisions, to the practical and doctrinal difficulties involved in the process of providing an expanded protection for buyers and consumers of goods.

A similar development is now taking place, in response to consumer expectations and to the need for realistic remedies, in the field of the sales of new homes by the vendor builder.[6] Like other courts we are now grappling with the complexities of that development. *Compare Yepsen v. Burgess, supra, with Chandler v. Bunick,* decided this day. 279 Or 353, 569 P2d 1037 (1977).

There has, moreover, been a growing concern in recent years about the need for curbing abuses in certain kinds of subdivision sales.[7] Primarily, how-

---

[5] *See, e.g.,* Restatement (Second) Torts § 402A, comment b; Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer),* 69 Yale L J 1099 (especially 1122-124) (1960); and *Greenman v. Yuba Power Products, Inc.,* 59 Cal 2d 57, 27 Cal Rptr 697, 377 P2d 897, 901 (1962), which are among the significant authorities stressing the inadequacy of the traditional sales warranty as a means of compensating consumers who are injured, or whose property is injured, by dangerously defective goods.

[6] The history of both the law and the literature in this area is surveyed in Comment, *Extension of Implied Warranties to Developer-Vendors of Completed New Homes,* 11 Urban L Ann 257 (1976). Cases are collected in 25 ALR3d 383, §§ 4, 6 (1969).

[7] *See, e.g.,* Comment, *Federal Regulation of Interstate Land Sales: The Limits of Full Disclosure,* 11 Col J Law & Soc Prob 133 (1975); Comment, *Regulation of Interstate Land Sales,* 25 Stan L Rev 605 (1973).

ever, that concern focuses on fraud and misrepresentation directed at purchasers who have no opportunity to examine the land, on high-pressure sales techniques, and on the failure of sellers to keep their promises to provide amenities as a part of the development. Congress and the state legislatures have taken steps to provide some measure of protection against those abuses.[8] In light of that legislative attention, we see no need for the courts to imply in all such sales, whether or not they involve significant potential for those particular abuses, a blanket warranty of the fitness of the land.

The National Conference of Commissioners on Uniform Laws has recently approved and recommended for enactment by the states a Uniform Land Transactions Act which is modeled in many respects on the Uniform Commercial Code. 13 ULA 1977 Supp 56-157 (Master ed 1975). That proposed uniform law contains provisions on warranties of quality. Section 2-308, dealing with express warranties, says that a provision that real estate may be put only to a specified use is an express warranty that the specified use is lawful. Such a provision is not made equivalent to a warranty of fitness for a particular use. Section 2-309, covering implied warranties, provides that a seller who is in the business of selling real estate warrants that the real estate is "suitable for the ordinary uses of real estate of its type * * *." Although this language is broad enough to support plaintiffs' position, the commissioners' comments to Section 2-309 indicate that their primary concern was with the quality and suitability of construction and improvements. The comments contain no direct reference to latent defects in the sale of unimproved land.

If this problem requires attention insofar as any serious unmet need for the protection of purchasers or

---

[8]The federal legislation is the Interstate Land Sales Full Disclosure Act, 15 USC §§ 1701-20. Citations to and a discussion of state legislation may be found in Comment, supra n. 7, 25 Stan L Rev 605. Oregon's legislation is found at ORS 92.305 through 92.820.

lessees of subdivided land is concerned, the legislature is capable of correcting the situation. We have found only one reported case in which the court has implied a warranty like the one the plaintiffs urge us to adopt. In *Hinson v. Jefferson,* 287 NC 422, 215 SE2d 102 (1975), a lot was sold subject to a restrictive covenant limiting its use to the construction of a single-family dwelling. Unknown to either party at the time of the sale, the lot had severe drainage problems which made it unfit for the installation of an on-site sewage disposal system. The lot could not, therefore, be used for the only purpose permitted by the restrictive covenants. Finding that the sellers could not reasonably have known of this condition at the time of the sale, the court nevertheless permitted the purchasers to rescind the transaction on the theory of a breach of an implied warranty which arose out of the restrictive covenant.

Whether or not we would approve the result in *Hinson* in a suit for rescission on comparable facts,[9] we decline to adopt its theoretical basis to support an action for damages. If both parties are free from fault, as we must assume for purposes of this analysis, there is no compelling reason to require the seller (or lessor) rather than the purchaser (or lessee) to bear fortuitous losses. We must assume that the defendant neither knew nor should have known that plaintiffs' lot would be susceptible to erosion.

In summary, under the facts alleged in the complaint, we are satisfied that the conventional and time-tried means of relief for persons in plaintiffs' position give them adequate protection.

The judgment of the trial court is affirmed.

---

[9] *See, e.g., Souza v. Jackson Co. Fed. S & L,* 256 Or 220, 472 P2d 272 (1970); *Slocum v. Leffler,* 272 Or 700, 538 P2d 906 (1975).