428 So.2d 654 (1983)
Donald J. CONKLIN, et ux, et al., Petitioners,
v.
Faye Y. HURLEY, Raymond J. Hurley, and Carriage Hill Limited Partnership, Respondents.
No. 61799.
Supreme Court of Florida.
March 10, 1983.
*655 Arthur C. Koski of Koski, Mateer, Gillespie & Allison, Boca Raton, for petitioners.
Jerry Oxner, West Palm Beach, Chesterfield Smith, Steven D. Merryday and Steven L. Brannock of Holland & Knight, Tampa, and Robert S. Levy of Robert S. Levy, P.A., West Palm Beach, for respondents.
Stephen W. Metz, Robert M. Rhodes and James C. Hauser of Messer, Rhodes & Vickers, Tallahassee, for Florida Home Builders Ass'n, amicus curiae.
McDONALD, Justice.
The Fourth District Court of Appeal has certified to us that its decision in this cause passes upon a question of great public importance. We have jurisdiction pursuant to Florida Constitution, article V, section 3(b)(4). The question certified to us is:
Do implied warranties of fitness and merchantability extend to first purchasers of residential real estate for improvements to the land other than construction of a home and other improvements immediately supporting the residence thereon, such as water wells and septic tanks?
Hurley v. Conklin, 409 So.2d 148, 151 (Fla. 4th DCA 1982). We approve the lower court's refusal to extend implied warranties of fitness and merchantability to the facts at hand and respond to the certified question.
Petitioners each purchased vacant waterfront lots from respondent Carriage Hill Limited Partnership (Carriage Hill), a subdivision developer. During the course of development respondent Raymond S. Hurley (Hurley), acting as managing general partner for Carriage Hill, entered into a contract with P & H Seawall and Piling Company (P & H), which was also managed by Hurley, for the construction of a seawall abutting the lots subsequently purchased by petitioners.
In 1971 and 1972 Carriage Hill entered into contracts for the sale of the lots involved in this suit. With one exception each of these contracts was assigned to third parties before being purchased by the respective petitioners. However, in each instance, upon closing, the deed to the property passed directly from Carriage Hill to the individual petitioners.
*656 Following unusually heavy rains in January 1974, 250 feet of seawall abutting petitioners' lots collapsed. The five petitioners filed actions against Carriage Hill for breach of an implied warranty of fitness. Carriage Hill joined Mr. and Mrs. Hurley as third party defendants in a claim for indemnity. The trial court found that an implied warranty of fitness extended to petitioners and that such warranty had been breached. The court further found that Carriage Hill was entitled to be indemnified by the Hurleys. The Fourth District Court of Appeal reversed the trial court, holding that the doctrine of implied warranty of fitness, previously extended in this state to purchasers of new homes, should not be extended to protect purchasers of residential lots on which seawalls had been constructed.
Petitioners urge that imputing to Carriage Hill an implied warranty of fitness covering the collapsed seawall abutting their lots is a reasonable extension of the holding of Gable v. Silver, 258 So.2d 11 (Fla. 4th DCA), cert. dismissed, 264 So.2d 418 (Fla. 1972).[1] Evaluation of this argument requires, first, that we examine the policy underpinning Gable and its forebears in other states.
With Gable Florida joined a rapidly growing minority of states which has recognized, as an exception to the general rule of caveat emptor in sales of real estate, an implied warranty of habitability or merchantability in the sale of new residences. A majority of the jurisdictions in this country now recognizes such a warranty.[2] The significance of this rapid development in the law is best seen in historical perspective. The maxim caveat emptor, while originally developed to regulate the sale of chattels in the 17th and 18th centuries, also served as a convenient rule by which to resolve disputes arising from the sale of real property.[3] In the middle of this century an increasing number of courts and legislatures began to recognize that modern mass-production and mass-marketing techniques had unbalanced the relative bargaining strengths of consumers and manufacturers of personalty. For example, several decisions in the early *657 1960s were based in part upon the reliance placed upon automobile manufacturers as a deliberate result of nationwide sales and marketing. Lang v. General Motors Corp., 136 N.W.2d 805 (N.D. 1965); Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69 (1960). Of broader effect was the passage by virtually every state of the Uniform Commercial Code, section 314 of which provides an implied warranty of merchantability for goods sold by a merchant in kind.[4]
Parallel to, and in some cases drawing upon, these developments in the implied warranty of goods, a number of American courts began to find implied warranties of fitness or habitability in the sale of new residences if the dwellings were still under construction.[5] Finally, in the 1960s the implied warranty of habitability began to be extended to first purchasers of completed houses when bought from the builder-vendor.[6] In commenting on the developing trend, the Supreme Court of Arkansas noted the disparity of protection otherwise afforded buyers of goods as opposed to new home buyers.
Yet there is nothing really surprising in the modern trend. The contrast between the rules of law applicable to the sale of personal property was so great as to be indefensible. One who bought a chattel as simple as a walking stick or a kitchen mop was entitled to get his money back if the article was not of merchantable quality. But the purchaser of a $50,000 home ordinarily had no remedy even if the foundation proved so defective that the structure collapsed into a heap of rubble.
Wawak v. Stewart, 247 Ark. 1093, 1094-95, 449 S.W.2d 922, 923 (1970). Another in this line of cases draws the analogy between the purchase of a new home and other property, more traditionally viewed as chattel, even more clearly:
Although considered to be a "real estate" transaction because the ownership to land is transferred, the purchase of a residence is in most cases the purchase of a manufactured product  the house. The land involved is seldom the prime element in such a purchase, certainly not in the urban areas of the state.
Smith v. Old Warson Development Company, 479 S.W.2d 795, 799 (Mo. 1972).
Seen in light of the historic application of caveat emptor to sales in general and the derogation of that maxim in the sales of chattel goods, it is plain that Gable and its forebears recognize a distinction between modern home-buying practices and traditional real estate sales in which land was the key element.[7] As expressed in DeRoche v. Dame, 75 A.D.2d 384, 387, 430 N.Y.S.2d 390 (N.Y.), appeal dismissed, 51 N.Y.2d 821, 413 N.E.2d 366, 433 N.Y.S.2d 427 (1980):
The rationale of the cases which relax or abandon the doctrine of caveat emptor is that the purchaser is not in an equal bargaining position with the builder-vendor *658 of a new dwelling, and the purchaser is forced to rely upon the skill and knowledge of the builder-vendor with respect to the materials and workmanship of an adequately constructed dwelling house. Furthermore, those courts recognize that although the contract may be couched in terms of the sale of realty, the purchaser sees the transaction primarily as the purchase of a house, with the land incident thereto.
Common threads running through all the decisions extending implied warranties to purchasers of new houses are the inability of the ordinarily prudent homebuyer to detect flaws in the construction of modern houses and the chattel-like quality of such mass-produced houses.[8] In commentaries frequently referred to in the cases extending implied warranties to purchasers of new homes legal scholars have pointed to these factors as prime reasons for the inequity of applying caveat emptor to such sales.[9] These were certainly the concerns of this Court when it adopted as its own the decision of the Fourth District Court of Appeal in Gable.
Returning to the case at hand, we fail to see how the policy upon which Gable and its kindred were based would be furthered by application here. None of the petitioners purchased a dwelling from Carriage Hill. The seawall was not part of a completed structure. Indeed, each of the petitioners bought what was essentially an empty lot, the only improvement being the defective seawall. Purchasers of such relatively unimproved realty may more reasonably be expected to inspect the property knowledgeably before purchase and may more likely be able to bargain for an express warranty than those who buy as complex a structure as a modern home.
Our view is supported by several recent decisions of jurisdictions which have held the doctrine of implied warranty inapplicable to the sale or long-term lease of land per se. Cook v. Salishan Properties, Inc., 279 Or. 333, 569 P.2d 1033 (1977); Witty v. Schramm, 62 Ill. App.3d 185, 19 Ill.Dec. 669, 379 N.E.2d 333 (1978); Jackson v. River Pines, 276 S.C. 29, 274 S.E.2d 912 (1981). While none of these cases involved land with the identical type and degree of development presented here, we find the reasoning in each to be applicable and persuasive.
In Cook plaintiffs entered into a 99-year lease[10] on a residential, seaside lot which was part of a large residential resort development. After plaintiffs built a permanent home on the lot, erosion of the lot diminished the value of both house and lot. Plaintiffs argued that pursuant to Yepsen v. Burgess, 269 Or. 635, 525 P.2d 1019 (1974), the developers impliedly warranted that the lot was fit for construction of permanent residential structures. In rejecting this argument the Oregon court reasoned:
These justifications, which we found persuasive in the aggregate in Yepsen, are of two types: a recognition of consumer expectation on the one hand and, on the other, an acknowledgment that buyers of houses, like buyers of other goods, must of necessity rely on the expertise of the builder or manufacturer. Both of these considerations have some application to *659 the sale of land by a subdivider-developer. The question is whether the extent of that applicability is sufficient to justify the extension of warranty principles to the sale or lease of developed but unimproved land. We are of the opinion that it is not.
279 Or. at 337, 569 P.2d at 1035.
In this case it appears that the petitioners bought their lots for the primary, if not exclusive, purpose of investment, with an eye toward resale to other investors or to homebuilders. To extend the implied warranty doctrine of Gable to these petitioners would be to ignore the consumer-protection emphasis upon which Gable and the decisions from which it sprang were founded. Those who speculate in land, as a class, simply do not need the sort of protection which Gable affords homebuyers. Those who regularly trade in the real estate market are apt to enjoy a much stronger bargaining position vis-a-vis their vendors than is the average individual purchasing a mass-produced house or condominium from a developer (the type of transaction envisioned by Gable). Regardless of the extent of their involvement in the real estate market, investors share a relatively stronger position at the bargaining table with developers than do homebuyers as a class because the investor may always choose to invest his excess capital elsewhere. The typical family looking for a residence not only is seeking the basic necessity of shelter, but often must do so within the time constraints imposed by career demands. As noted above, those who regularly invest in real estate are likely to be more knowledgeable about the property they purchase than the homebuyer who may purchase only one or two homes in a lifetime. Also, the economic consequences of a defect in the property purchased is likely to affect the homebuyer much more severely than the investor. For most consumers a house is the largest investment of a lifetime, often tying up most of one's savings and a large percentage of income. A serious defect in a home may render a family or individual financially destitute. The investor, on the other hand, risks financial setback, but not necessarily catastrophe if the land he purchases proves to be less fit for its intended purpose than expected. For example, petitioner Conklin, by his own admission, bought his lot for speculative purposes. He paid $28,000 for it and sold it, with the damaged seawall, for $31,500. He claims $6,500 damages based upon an "asking" price of $37,000 to $39,000 for similar lots in the area at the time he sold. Protection against this kind of loss, based merely upon an expectancy, was not intended by this Court when it adopted Gable.
Our refusal to extend the doctrine of implied warranty to the facts of this case in no way precludes petitioners from recovering any losses they may be able to prove. As noted by the district court, petitioners may still pursue an action in negligence against the builders of the seawall. Nothing in our opinion shall be construed to preclude such an action.
Having fully considered the briefs submitted by the parties and amicus curiae, as well as oral argument on behalf of petitioners and respondent Carriage Hill, the decision of the Fourth District Court of Appeal is approved.
It is so ordered.
BOYD, OVERTON and EHRLICH, JJ., concur.
ADKINS, J., dissents with an opinion, in which ALDERMAN, C.J., concurs.
ADKINS, Justice, dissenting.
The underlying principle of Gable v. Silver, 258 So.2d 11 (Fla. 4th DCA), cert. dismissed, aff'd, 264 So.2d 418 (Fla. 1972), and the decisions in other states which have extended implied warranties to realty is a recognition that in some situations the rigid common law maxim of caveat emptor is inequitable. The courts following this trend have recognized that there ought to be an implicit understanding when an agreed price is paid for a house that it is reasonably fit for the purpose for which it is to be used. Putnam v. Roundebush, 352 So.2d 908 (Fla. 2d DCA 1977); Lyon v. *660 Ward, 28 N.C. App. 446, 221 S.E.2d 727 (1976); Cook v. Salishan Properties, Inc., 279 Or. 333, 569 P.2d 1033 (1977); Humber v. Morton, 426 S.W.2d 554 (Tex. 1968); Tavares v. Horstman, 542 P.2d 1275 (Wyo. 1975). In addition to recognizing consumer expectations, these decisions have also been premised on the inability of purchasers to detect flaws by inspecting the premises and purchaser reliance on the expertise and/or the representations of sellers.
This Court, by adopting the opinion of the Fourth District Court of Appeal in Gable, specifically justified the extension of implied warranties to purchasers of new condominiums in Florida on five bases: 1) the importance of purchasing a home; 2) implied warranties would discourage negligent construction; 3) the builder-vendor is in a better position to know of defects; 4) a home buyer often has no other remedy available; and 5) the builder-vendor is more capable of distributing the cost of his mistakes than is the home buyer. I fail to understand how these policy considerations would not be furthered by extending the availability of implied warranties to purchasers of subdivided waterfront lots which have been improved with a seawall.
The cases which have dealt with the issue of extending implied warranties to unimproved lots have refused to extend the warranties because the damage was not caused by a defect for which the seller was responsible, Burger v. Hector, 278 So.2d 636 (Fla. 1st DCA 1973); Witty v. Schramm, 62 Ill. App.3d 185, 19 Ill.Dec. 669, 379 N.E.2d 333 (1978), or there were no crucial details or aspects inherent to the subject of the purchase which were beyond the buyer's power to inspect. Cook, 279 Or. 333, 569 P.2d 1033. In Cook, the court stated:
[W]hile it is true that the ordinary purchaser of subdivided land relies, to a great extent, on the expertise of the developer, the degree of the purchaser's necessary reliance is not as great as that of the purchaser of a home. Land is accessible for inspection before it is purchased. Although we do not suggest that the prospective purchaser's opportunity to inspect, or the expertise which he or she brings to that inspection, is equal to that of the developer, nevertheless the situation is not comparable to that involving a completed house, where many of the crucial details, such as wiring and structural materials, are placed beyond the purchaser's power to inspect by the construction process itself.
Id. at 338, 569 P.2d at 1035. The damage in this case was caused by a defect in the seawall for which the seller was responsible. The complexity of seawall construction, like modern housing construction, is beyond the buyer's ability to inspect. Therefore, the facts do not fall within the confines of the decisions denying implied warranties to unimproved real property.
I find particularly disturbing the majority's basic premise that "investors" should not fall within the ambit of our policy concerns for consumer protection. First, what makes one an investor? Is a person who owns one condominium and rents it out an investor? How do we define an investor?  by the amount of capital he has invested, or the number of acres, or how often he makes a purchase? Would it be fair to say that any buyer making a purchase of real property for the purpose of an investment has a "relatively stronger position at the bargaining table with developers than do homebuyers as a class?" Furthermore, I can see no relevance in the assertion that "the investor may always choose to invest his excess capital elsewhere." It is perhaps naive and unrealistic to state that the typical family is "seeking the basic necessity of shelter" in looking for a residence. A considerable number of families living in homes in Florida fully expect to resell their homes within a relatively short period of time and are often motivated to do so by the prospect of making a substantial profit on their investment in that home. It is inequitable to provide protection to some but not to others based on an often arbitrary determination of whether that individual can be classified as an investor.
In Gable, this Court cautioned that courts must be cognizant of "present day trends, *661 logic and practical justice in realty dealings." 258 So.2d at 18. In Florida, waterfront living is common and desired. The construction of waterfront homes along the canals of this state necessitates the construction of many miles of seawalls to ensure that waterfront property may be developed and preserved from the elements of time and nature. More importantly, the seawall on a waterfront lot is a basic and indispensible element of the foundation of any residence which would be constructed on the lots. The structural integrity of any new residence would be completely dependent on the ability of the seawall to retain and support the soil beneath the proposed residence. A failure of the improvement would clearly jeopardize any structure which it supports. The cases which have extended implied warranties to include improvements outside the basic structure of a dwelling have looked to whether the improvement was an integral part of the structure or immediately supporting the structure. Georgia-Pacific Corp. v. Squires Development Corp., 387 So.2d 986 (Fla. 4th DCA 1980); Rutledge v. Dodenhoff, 254 S.C. 407, 175 S.E.2d 792 (S.C. 1970); Tavares v. Horstman, 542 P.2d 1275 (Wyo. 1975). The seawalls in this development are an integral, necessary and essential element of the homes which will be built in this residential area. An extension of Gable to this factual situation is both logical and just.
A recognition of the parties' expectations is also overlooked by the majority. The expense of the seawall is a substantial portion of the agreed price for the realty. One of the prime elements in such a purchase is the improvement (seawall) made to the land which will render it fit for the intended purpose of the buyer.
I recognize that there are several common improvements made to residential property which have no relation to the fitness or habitability of a home such as landscaping, roads, and fences. I would not extend implied warranties to improvements which are not an integral part of the real estate purchase or are not supportive to the residence or proposed residence. For these reasons I also agree with the dissenting opinion below which noted that the question certified to us failed to clearly isolate the issues. Chief Judge Letts, in dissent, states:
This case has been confusing to me. My main concern is that while the majority opinion repeatedly points out that it is only dealing with the sale of waterfront lots as distinct from waterfront homes on those lots, there is, intertwined, discussion about residential real estate and wells and septic tanks which to me does not clearly isolate the issues. In this regard I think the trial judge was also confused.
As I see it, if the sales are for lots only, the certified question should place seawalls, wells and septic tanks in exactly the same category, whereas the opinion and the question might appear to differentiate them.
Likewise, if the contracts had been for the sale of waterfront homes on waterfront lots, then I would again place a seawall in exactly the same category as a septic tank or a well. I feel strongly that where the sale of a waterfront home is involved, if the waterfront home is created and built by the developer along with the creation and building of a man-made waterfront, a seawall is as necessary and as integral a part of the actual house building as is a sewer connection and a water supply. Accordingly, if the implied warranty of fitness applies at all, it ought to apply to all three.
Hurley v. Conklin, 409 So.2d 148, 151 (Letts, C.J., dissenting) (footnote omitted).
I must agree. Accordingly, I would follow the line of cases that have extended implied warranties to improvements supporting the house, including wells, septic tanks, and drain fields and extend the availability of an implied warranty to the petitioners here.
ALDERMAN, C.J., concurs.
NOTES
[1] This Court, in dismissing certiorari, adopted the decision of the Fourth District Court of Appeal as its own.
[2] At the time Gable was decided, 14 other states apparently had recognized, to some degree, the implied warranty of habitability of new homes. Gable, 258 So.2d at 11. In the intervening 10 years that minority of 15 has swollen to a majority of at least 33 states. Sims v. Lewis, 374 So.2d 298 (Ala. 1979); Columbia Western Corp. v. Vela, 122 Ariz. 28, 592 P.2d 1294 (1979); Wawak v. Stewart, 247 Ark. 1093, 449 S.W.2d 922 (1970); Pollard v. Saxe & Yolles Dev. Co., 12 Cal.3d 374, 525 P.2d 88, 115 Cal. Rptr. 648 (1974); Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399 (1964); Vernali v. Centrella, 28 Conn.Sup. 476, 266 A.2d 200 (1970); Koval v. Peoples, 431 A.2d 1284 (Del. Super. 1981); Gable v. Silver, 258 So.2d 11 (Fla. 4th DCA), cert. denied, 264 So.2d 418 (Fla. 1972); Bethlahmy v. Bechtel, 91 Idaho 55, 415 P.2d 698 (1966); Petersen v. Hubschman Constr. Co., 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d 1154 (1979); Barnes v. Mac Brown & Co., 264 Ind. 227, 342 N.E.2d 619 (1976); McFeeters v. Renollet, 210 Kan. 158, 500 P.2d 47 (1972); Crawley v. Terhune, 437 S.W.2d 743 (Ky. 1969); Banville v. Huckins, 407 A.2d 294 (Me. 1979); Loch Hill Constr. Co. v. Fricke, 284 Md. 708, 399 A.2d 883 (1979); Weeks v. Slavik Builders, Inc., 24 Mich. App. 621, 180 N.W.2d 503, aff'd, 384 Mich. 257, 181 N.W.2d 271 (1970); Brown v. Elton Chalk, Inc., 358 So.2d 721 (Miss. 1978); Smith v. Old Warson Dev. Co., 479 S.W.2d 795 (Mo. 1972); Chandler v. Madsen, 642 P.2d 1028 (Mont. 1982); Norton v. Burleaud, 115 N.H. 435, 342 A.2d 629 (1975); Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965); DeRoche v. Dame, 75 A.D.2d 384, 430 N.Y.S.2d 390 (N.Y.), appeal dismissed, 51 N.Y.2d 821, 413 N.E.2d 366, 433 N.Y.S.2d 427 (1980); Griffin v. Wheeler-Leonard & Co., 290 N.C. 185, 225 S.E.2d 557 (1976); Jeanguneat v. Jackie Hames Constr. Co., 576 P.2d 761 (Okl. 1978); Yepsen v. Burgess, 269 Or. 635, 525 P.2d 1019 (1974); Elderkin v. Gaster, 447 Pa. 118, 288 A.2d 771 (1972); Sousa v. Albino, 120 R.I. 461, 388 A.2d 804 (1978); Rutledge v. Dodenhoff, 254 S.C. 407, 175 S.E.2d 792 (1970); Brown v. Fowler, 279 N.W.2d 907 (S.D. 1979); Humber v. Morton, 426 S.W.2d 554 (Tex. 1968); Rothberg v. Olenik, 128 Vt. 295, 262 A.2d 461 (1970); House v. Thornton, 76 Wash.2d 428, 457 P.2d 199 (1969); Moxley v. Laramie Builders, Inc., 600 P.2d 733 (Wyo. 1979). At least one additional state has approved of the doctrine in dicta. Association of Apartment Owners of Park Towers v. Child, 1 Hawaii App. 130, 615 P.2d 756 (Haw. App. 1980).
[3] Wells, Implied Warranties in the Sale of New Homes, 23 U.Fla.L.Rev. 626 (1971).
[4] § 672.314, Fla. Stat. (1981).
[5] See, e.g., Vanderschrier v. Aaron, 103 Ohio App. 340, 140 N.E.2d 819 (1957); Hoye v. Century Builders, Inc., 52 Wash.2d 830, 329 P.2d 474 (1958). These decisions were based in part on a series of earlier English cases. Miller v. Cannon Estates, Ltd., [1931] 2 K.B. 113, [1931] All E.R.Rep. 93; Perry v. Shannon Dev. Co. Ltd., [1937] 4 All E.R. 390.
[6] Note 2, supra.
[7] In Columbia Western Corp. v. Vela, 122 Ariz. 28, 592 P.2d 1294 (1979), the Arizona Supreme Court stated:

In our opinion Voight [v. Ott, 86 Ariz. 128, 132, 341 P.2d 923 (1959)] is authority for the proposition that no implied warranties arise from the sale of realty, but this is not dispositive of the issue of implied warranties arising out of the construction of new housing which ultimately becomes "realty".
Id. at 30, 592 P.2d at 1296 (emphasis in original).
The South Carolina Supreme Court in Rutledge v. Dodenhoff, 254 S.C. 407, 175 S.E.2d 792 (1970), noted a similar differentiation:
In recent years, the efficacy of caveat emptor, to accomplish justice when applied to the sale of new houses by the builder, has been subjected to serious question and rejection by many courts in the light of modern developments in the residential building trade. Distinction has been drawn between the usual, normal sale of lands, and old buildings and a transaction where the vendor is also the builder of a new structure.
Id. at 413, 175 S.E.2d at 794 (emphasis supplied).
[8] See, e.g., Humber v. Morton, 426 S.W.2d 554, 561-62 (Tex. 1968), in which the Texas Supreme Court stated:

Obviously, the ordinary purchaser is not in a position to ascertain when there is a defect in a chimney flue, or vent of a heating apparatus, or whether the plumbing work covered by a concrete slab foundation is faulty.
* * * * * *
The caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home-buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work.
[9] See, e.g., Bearman, Caveat Emptor in Sales of Realty  Recent Assaults Upon the Rule, 14 Vand.L.Rev. 541 (1961); Roberts, The Case of the Unwary Home Buyer: The Housing Merchant Did It, 52 Cornell L.Rev. 835 (1967); Wells, supra note 3.
[10] The Oregon Supreme Court, in a footnote to Cook, 279 Or. at 338, 569 P.2d at 1034, noted that it attached no significance to the fact that a long-term lease rather than a sale was involved.