612 So.2d 669 (1993)
The HASKELL COMPANY and Service Merchandise Company, Inc., Appellants,
v.
The LANE COMPANY, LTD., Appellee.
The HASKELL COMPANY and H.J. Wilson Company, Inc., Appellants,
v.
The LANE COMPANY, LTD., Appellee.
Nos. 91-3835, 92-452.
District Court of Appeal of Florida, First District.
January 21, 1993.
*670 J. Craig Knox of Fuller, Johnson & Farrell, P.A., Tallahassee; William D. Brinton of Allen, Brinton & Simmons, P.A., Jacksonville, for appellant The Haskell Co.
David R. Martinez and R. Dennis Withers of Robins, Kaplan, Miller & Ciresi, Atlanta, Georgia for appellants H.J. Wilson Co., Inc. and Service Merchandise Co., Inc.
David H. Burns, Michael D. West and Joseph E. Brooks of Huey, Guilday, Kuersteiner & Tucker, P.A., Tallahassee, for appellee The Lane Co., Ltd.
WEBSTER, Judge.
In these consolidated appeals, each of the appellants seeks review of a summary final judgment entered against it, and in favor of appellee, The Lane Company, Ltd. (Lane). The Haskell Company (Haskell) challenges a summary judgment in favor of Lane on Haskell's contribution claim; and Service Merchandise Company, Inc. (Service Merchandise), and H.J. Wilson Company, Inc. (Wilson), challenge summary judgments in favor of Lane on their property damage claims arising from an alleged negligent failure to disclose the existence of a latent defect in the roof of a commercial building. The trial court based all three summary judgments upon the legal conclusion that, because of the doctrine of caveatemptor, Lane had no duty upon which a claim for negligence could be founded. We affirm, but certify to the supreme court a question which we believe to be of great public importance.

I.
In February 1980, Lane, as owner, entered into a contract with Haskell, as contractor, for the construction of a commercial building. In September or October 1980, the building was completed, and a lease was executed by Lane and a third party. As a result of a merger with the lessee, Wilson became the tenant in July 1981. In September 1981, Lane sold the building to First Capital Income Properties, Ltd., Series VI (First Capital), subject to the lease. In May 1985, Wilson became a wholly-owned subsidiary of Service Merchandise. In August 1985, First Capital sold the building to V & S Enterprises, Inc. (V & S), subject to the lease. In July 1986, during a severe rainstorm, a portion of the building's roof collapsed, causing significant damage to the property of Wilson/Service Merchandise; and personal injury to Agnes and Ben Spivey, who were shopping in the building.
The Spiveys sued Service Merchandise, Lane, Haskell and others, alleging that all had been negligent, and that such negligence had caused their injuries. (The Spiveys later dismissed Service Merchandise.) Service Merchandise and Wilson filed a separate action against Lane, Haskell and others, seeking to recover property damages. They alleged that Haskell had negligently constructed the building, and the roof in particular; and that Lane had negligently failed either to disclose to Service Merchandise, Wilson or their "predecessors in interest" that the roof drainage system was inadequate, "or to see that [the] inadequacies were corrected." Haskell filed cross-claims against Lane in both actions. Haskell alleged that, if it was found to be liable, it would be entitled to contribution from Lane because Lane was also negligent in that it "knew or should have known" that the roof drainage system was inadequate, but failed properly to correct the problem.
It is unclear from the record whether Lane knew (or reasonably should have known) that there were problems with the drainage system for the roof of the building. It is even less clear that, assuming Lane knew (or reasonably should have known) that there were problems with the drainage system, it also knew (or reasonably should have known) that those problems were serious enough to pose a real threat to the structural integrity of the *671 roof. Likewise unclear is whether the problems with the drainage system should have been apparent upon observation or were latent; and whether Lane's vendee, First Capital, knew (or reasonably should have known) about the problems. What is clear from the record is that there is no allegation that Lane misrepresented or intentionally concealed from First Capital any fact regarding the adequacy of the roof drainage system; and no evidence which would support such an allegation.
Relying upon the lack of either pleadings or proof to suggest that it had misrepresented or intentionally concealed from First Capital any fact regarding the adequacy of the roof drainage system, Lane argued that the doctrine of caveat emptor entitled it to the entry of summary judgments in its favor on the claims made by appellants. Appellants responded that the doctrine of caveat emptor did not apply. Rather, they contended that section 353 of the Restatement (Second) of Torts (1965) was controlling, and required that Lane's motions for summary judgment be denied. The trial court concluded that, as a matter of law, the doctrine of caveat emptor did apply to transactions involving the purchase and sale of commercial real property in Florida. Accordingly, it concluded, further, that, the building sold by Lane having been commercial real property, "Lane had no duty upon which a claim for negligence could be founded" because of the doctrine of caveat emptor. Therefore, it granted Lane's motions for summary judgment.

II.
The origins of the doctrine of caveat emptor have been traced to sixteenth-century England. See Walton H. Hamilton, The Ancient Maxim Caveat Emptor, 40 Yale L.J. 1133, 1164 (1931). Initially, it was used to regulate the purchase and sale of chattels. Id. See also Conklin v. Hurley, 428 So.2d 654, 656 (Fla. 1983); Thomas N. Wells, Comment, Implied Warranties in the Sale of New Homes, 23 U.Fla.L.Rev. 626 (1971). However, by the early seventeenth century, the doctrine was also being applied to the purchase and sale of real property. 1 Coke upon Littleton 102a (15th ed. London 1794) (1st ed. London 1628) ("Note, that by the civil law every man is bound to warrant the thing that he selleth or conveyeth, albeit there be no expresse warranty; but the common law bindeth him not, unlesse there be a warranty, either in deed or in law; for caveat emptor.") The doctrine came to this country as a part of the common law of England. Hamilton, supra, at 1178. By 1871, Justice Davis, speaking for the Supreme Court, was able to say, "Of such universal acceptance is the doctrine of caveat emptor in this country, that the courts of all the States in the Union where the common law prevails, with one exception (South Carolina), sanction it." Barnard v. Kellogg, 77 U.S. (10 Wall.) 383, 388-89, 19 L.Ed. 987, 989 (1871).
The doctrine of caveat emptor (literally, "let the buyer beware") provides that, when parties deal at arm's length, buyers are expected "to fend for themselves, protected only by their own skepticism as to the value and condition of the subject of the transaction." Biff Craine, Note, Real Property  Sellers' Liability for Nondisclosure of Real Property Defects  Johnson v. Davis, 480 So.2d 625 (Fla. 1985), 14 Fl.St.U.L.Rev. 359, 361 (1986). Absent an express agreement, a material misrepresentation or active concealment of a material fact, the seller cannot be held liable for any harm sustained by the buyer or others as the result of a defect existing at the time of the sale. See, e.g., W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 64, at 447 (5th ed. 1984); Frona M. Powell, The Seller's Duty to Disclose in Sales of Commercial Property, 28 Am. Bus.L.J. 245, 248-50 (1990). Mere nondisclosure of a material fact, unaccompanied by words or acts sufficient to constitute active concealment, is not actionable. Id. See also Ramel v. Chasebrook Construction Co., 135 So.2d 876, 882 (Fla. 2d DCA 1961). In other words, every purchase is a gamble. See Hamilton, supra, at 1187; 2 Alphonse M. Squillante & John R. Fonseca, Williston on Sales § 15-12, at 364 (4th ed. 1974).
*672 The doctrine of caveat emptor has come under attack in recent years as contrary to modern concepts of justice and fair dealing. See generally Keeton et al., supra, § 106, at 738; Powell, supra, at 253-54. Somewhat ironically, the first area of the law in which the doctrine has ceased to have any meaningful impact is that to which the doctrine was first applied  the purchase and sale of personal property. With regard to such transactions, every state except Louisiana has replaced the doctrine of caveat emptor with the requirement that the parties deal fairly and in good faith, by adopting Article Two of the Uniform Commercial Code  and in particular section 2-314, regarding implied warranties of merchantability. See ch. 672, Fla. Stat. (1991).
Despite the fact that it has ceased to have any impact upon transactions involving personal property, the doctrine has continued to influence transactions involving real property. 7 Samuel Williston, A Treatise on the Law of Contracts § 926, at 800-01 (3d ed. 1963). Like other states, Florida had for many years applied the doctrine to both leases and sales. See, e.g., Brooks v. Peters, 157 Fla. 141, 25 So.2d 205 (1946) (lease); Ramel v. Chasebrook Construction Co., 135 So.2d 876 (Fla. 2d DCA 1961) (sale). Gradually, however, the courts began to move away from the doctrine and toward a more modern rule, which emphasizes fair dealing.
In Florida, the first step was taken in Gable v. Silver, 258 So.2d 11 (Fla. 4th DCA), cert. discharged, 264 So.2d 418 (Fla. 1972). In Gable, the court rejected the continued applicability of the doctrine of caveat emptor to the purchase of new homes or condominiums. Instead, it "flatly declare[d] that ... implied warranties of fitness and merchantability extend to the purchase of new condominiums [and homes] ... from builders." Id. at 18. In its order discharging the writ of certiorari which had issued for review of the district court's decision, the supreme court said, "[W]e hold that the District Court of Appeal has correctly decided the cause and its decision is adopted as the ruling of this Court." 264 So.2d at 419.
The next step was taken in Mansur v. Eubanks, 401 So.2d 1328 (Fla. 1981). In Mansur, residential tenants who had been injured while attempting to light defective gas-fueled appliances in an apartment sued the landlord. The trial court entered summary judgments in favor of the landlord, and this court affirmed, citing Brooks v. Peters, 157 Fla. 141, 25 So.2d 205 (1946), for the proposition that the doctrine of caveat emptor (or, in the case of a lease, caveat lessee) precluded recovery. Mansur v. Eubanks, 368 So.2d 645 (Fla. 1st DCA 1979). Noting that "[w]e live in an age when the complexities of housing construction place the landlord in much better position than the tenant to guard against dangerous conditions" (401 So.2d at 1330), the supreme court reversed, overruling Brooks v. Peters. It said:
We hold that the owner of a residential dwelling unit, who leases it to a tenant for residential purposes, has a duty to reasonably inspect the premises before allowing the tenant to take possession, and to make the repairs necessary to transfer a reasonably safe dwelling unit to the tenant unless defects are waived by the tenant... .
After the tenant takes possession, the landlord has a continuing duty to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant, unless waived by the tenant.
Id. at 1329-30.
In Conklin v. Hurley, 428 So.2d 654 (Fla. 1983), the supreme court was called upon to determine whether the implied warranties of merchantability and fitness held in Gable v. Silver to extend to purchases of new residences should be extended as well to the purchase of a lot which, but for a defective seawall, was unimproved. The court concluded that the holding of Gable v. Silver should not be extended under such circumstances. It said:
Common threads running through all the decisions extending implied warranties to purchasers of new houses are the inability of the ordinarily prudent homebuyer to detect flaws in the construction of *673 modern houses and the chattel-like quality of such mass-produced houses... . These were certainly the concerns of this Court when it adopted as its own the decision of the Fourth District Court of Appeal in Gable.

... [W]e fail to see how the policy upon which Gable and its kindred were based would be furthered by application here... . [E]ach of the petitioners bought what was essentially an empty lot, the only improvement being the defective seawall. Purchasers of such relatively unimproved realty may more reasonably be expected to inspect the property knowledgeably before purchase and may more likely be able to bargain for an express warranty than those who buy as complex a structure as a modern home.
Id. at 658 (footnote omitted). The court also said:
[P]etitioners bought their lots for the primary, if not exclusive, purpose of investment, with an eye toward resale to other investors or to homebuilders. To extend the implied warranty doctrine of Gable to these petitioners would be to ignore the consumer-protection emphasis upon which Gable and the decisions from which it sprang were founded. Those who speculate in land, as a class, simply do not need the sort of protection which Gable affords homebuyers. Those who regularly trade in the real estate market are apt to enjoy a much stronger bargaining position vis-a-vis their vendors than is the average individual purchasing a mass-produced house or condominium from a developer... . Regardless of the extent of their involvement in the real estate market, investors share a relatively stronger position at the bargaining table with developers than do homebuyers as a class because the investor may always choose to invest his excess capital elsewhere... . Also, the economic consequences of a defect in the property purchased is [sic] likely to affect the homebuyer much more severely than the investor.
Id. at 659.
Justice Adkins (joined by Chief Justice Alderman) dissented in Conklin. Noting that "[t]he complexity of seawall construction, like modern housing construction, is beyond the buyer's ability to inspect" (id. at 660), Justice Adkins said:
This Court, by adopting the opinion of the Fourth District Court of Appeal in Gable, specifically justified the extension of implied warranties to purchasers of new condominiums ... on five bases: 1) the importance of purchasing a home; 2) implied warranties would discourage negligent construction; 3) the builder-vendor is in a better position to know of defects; 4) a home buyer often has no other remedy available; and 5) the builder-vendor is more capable of distributing the cost of his mistakes than is the home buyer. I fail to understand how these policy considerations would not be furthered by extending the availability of implied warranties to purchasers of subdivided waterfront lots which have been improved with a seawall.
Id. Justice Adkins also noted his concern regarding the premise that "investors" should not receive the same protections as "consumers," because he perceived great difficulty in defining what constitutes an "investor" in any given case. He said, "It is inequitable to provide protection to some but not to others based on an often arbitrary determination of whether that individual can be classified as an investor." Id.
Less than three years after it had decided Conklin, the supreme court decided Johnson v. Davis, 480 So.2d 625 (Fla. 1985). Johnson involved an action for breach of contract and fraud regarding the purchase of a 3-year-old home which, the buyers learned after they had purchased it, had a defective roof. One of the issues presented for review was whether the sellers, who were aware of the problems regarding the roof, had a duty to disclose the problems to the buyers. Justice Adkins, now writing for the majority, recognized that this issue constituted a frontal assault upon the doctrine of caveat emptor. Referring to prior Florida cases which had affirmed the continued applicability of the doctrine in the context of residential sales, the court said:

*674 These unappetizing cases are not in tune with the times and do not conform with current notions of justice, equity and fair dealing. One should not be able to stand behind the impervious shield of caveat emptor and take advantage of another's ignorance. Our courts have taken great strides since the days when the judicial emphasis was on rigid rules and ancient precedents. Modern concepts of justice and fair dealing have given our courts the opportunity and latitude to change legal precepts in order to conform to society's needs. Thus, the tendency of the more recent cases has been to restrict rather than extend the doctrine of caveat emptor. The law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it.
Id. at 628. The court expressed its holding with the following words:
[W]e hold that where the seller of a home knows of facts materially affecting the value of the property which are not readily observable and are not known to the buyer, the seller is under a duty to disclose them to the buyer. This duty is equally applicable to all forms of real property, new and used.
Id. at 629.
"Johnson does not convert a seller of a house into a guarantor of the condition of the house... . [T]o prove a cause of action under Johnson, a buyer of a house must prove the seller's knowledge of a defect which materially affected the value of the house." Slitor v. Elias, 544 So.2d 255, 258-59 (Fla. 2d DCA 1989). Subsequent decisions have held that the duty imposed upon sellers by Johnson does not require disclosure to third parties not in privity with the seller. See Wallis v. South Florida Savings Bank, 574 So.2d 1108 (Fla. 2d DCA 1990); Kovach v. McLellan, 564 So.2d 274 (Fla. 5th DCA 1990).

III.
It is clear that the doctrine of caveat emptor no longer has any application to leases of residential real property (Mansur v. Eubanks), or to sales of new or used residences (Johnson v. Davis). However, it would appear that the doctrine still applies to leases of commercial real property. Veterans Gas Co. v. Gibbs, 538 So.2d 1325 (Fla. 1st DCA 1989). Similarly, it would appear that the doctrine continues to apply to sales of commercial real property. Futura Realty v. Lone Star Building Centers (Eastern), Inc., 578 So.2d 363 (Fla. 3d DCA), review denied, 591 So.2d 181 (Fla. 1991).
In this case, commercial real property is involved. Moreover, it does not appear that any of the appellants were in privity with Lane. Given the status of the doctrine of caveat emptor as it relates to commercial real property transactions, it would appear that appellants are precluded from seeking recovery from Lane for their damages. However, appellants argue that the doctrine has no bearing on their right to sue Lane; instead, they contend that they are entitled to seek damages from Lane by virtue of section 353 of the Restatement (Second) of Torts (1965). We are unable to accept appellants' argument.
Section 353 of the Restatement (Second) of Torts, which is titled "Undisclosed Dangerous Conditions Known to Vendor," reads:
(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm ["physical harm" is defined in section 7 as "physical impairment of the human body, or of land or chattels"] caused by the condition after the vendee has taken possession, if
(a) the vendee does not know or have reason to know of the condition or the risk involved, and
(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

*675 (2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.
We are unable to accept appellants' argument that section 353 entitles them to pursue their claims against Lane for two reasons. First, the drafters of the Restatement (Second) recognize that section 353 is an exception to the doctrine of caveat emptor:
Under the ancient doctrine of caveat emptor, the original rule was that, in the absence of express agreement, the vendor of land was not liable to his vendee, or a fortiori to any other person, for the condition of the land existing at the time of transfer. As to sales of land this rule has retained much of its original force... . The vendee is required to make his own inspection of the premises, and the vendor is not responsible to him for their defective condition, existing at the time of transfer. Still less is he liable to any third person who may come upon the land, even though such entry is in the right of the vendee.
To this rule an exception has developed as to undisclosed dangerous conditions known to the vendor, as to which see § 353.
Restatement (Second) of Torts § 352 cmt. a (1965). Second, we have been unable to find any appellate decision in Florida which expressly adopts section 353.

IV.
We believe that, if the doctrine of caveat emptor is to be replaced as the law applicable to commercial real property transactions in Florida, by section 353 of the Restatement (Second) or some other rule or rules, that decision should be made by the supreme court, rather than by this court. See, e.g., Gilliam v. Stewart, 291 So.2d 593, 594 (Fla. 1974) (when a district court decides that an "ancient precedent" should be overruled, it is that court's duty to follow that precedent, and certify the question to the supreme court). Accordingly, we affirm. However, because we believe that the time has come for a critical evaluation of the merit of continued adherence to the doctrine of caveat emptor, we believe, further, that it is appropriate for us to express our views on this subject. See, e.g., Hoffman v. Jones, 280 So.2d 431, 434 (Fla. 1973) (while district courts are not free to disregard precedent established by the supreme court, they are free to state their reasons for advocating change).
It seems to us that there is little justification for continuing to draw a distinction between transactions involving residential real property and transactions involving commercial real property. Many of the policy considerations used to justify a duty to disclose in residential cases apply with equal force to commercial cases. Is it reasonable to assume that a prospective buyer (or lessee) of commercial property is significantly more likely to be capable of examining the property to determine whether hidden defects exist than is a prospective buyer (or lessee) of residential property? What of the small businessman, or professional in solo practice  do they possess the bargaining power to insist upon express warranties from the seller (or lessor) of a small store or office? Such distinctions may have some merit as to the large corporate purchaser (or lessee), but clearly are inappropriate with regard to a substantial segment of the business community. "Courts should not assume that there is a relevant distinction between purchasers who invest in commercial property and `simple, gullible folks unable to protect themselves.' People who buy [or lease] real property for business purposes vary widely in their experience, knowledge, sophistication, bargaining power, wealth, and access to outside advisers and experts." Frona M. Powell & Jane P. Mallor, The Case for an Implied Warranty of Quality in Sales of Commercial Real Estate, 68 Wash.U.L.Q. 305, 333 (1990) (footnotes omitted). Moreover, the buyer (or lessee) of commercial property has the same reasonable expectations as does the buyer (or *676 lessee) of a residence  that he or she will receive what was bargained for, and be able to use it for its intended purposes. Likewise, requiring disclosure in commercial transactions will encourage good workmanship in commercial structures, just as it will with regard to residential structures. Finally, it seems relatively clear to us that Justice Adkins' statement in Johnson v. Davis applies with equal force, regardless of the nature of the property  "One should not be able to stand behind the impervious shield of caveat emptor and take advantage of another's ignorance." 480 So.2d at 628.
We believe that the time has come to add caveat emptor to the trash heap of discarded legal doctrines and rules, along with such concepts as contributory negligence, assumption of risk and last clear chance. In its place, we would require in all real property transactions (sales or leases) full disclosure to the buyer or lessee of all facts material to either the value or the condition of the property. The use for which the property is intended  i.e., whether residential or commercial  would be irrelevant. This duty to disclose would extend only to the buyer. It would not extend to those not in privity with the seller. However, we would also adopt section 353 of the Restatement (Second) of Torts (1965), which is applicable to latent conditions involving "unreasonable risk to persons on the land," and which extends protection to "the vendee and others upon the land with the consent of the vendee or his subvendee." We believe that such changes would be consistent with the "current notions of justice, equity and fair dealing" discussed in Johnson v. Davis, 480 So.2d at 628.
Because we are constrained to do so, we affirm. However, we certify the following question to be one of great public importance:
SHOULD THE COMMON LAW DOCTRINE OF CAVEAT EMPTOR CONTINUE TO APPLY TO COMMERCIAL REAL PROPERTY TRANSACTIONS; AND, IF NOT, WITH WHAT LEGAL PRINCIPLES SHOULD IT BE REPLACED?
AFFIRMED.
ALLEN, J., concurs.
WOLF, J., specially concurs with written opinion.
WOLF, Judge, specially concurring.
I agree with the majority that we have no alternative but to affirm the decision of the trial court under existing law in this state, and that the supreme court should revisit the issue of whether liability may be imposed for failure of a seller to disclose a material defect in commercial realty. While the majority makes a strong argument for abolition of the doctrine of caveat emptor in all real estate transactions, it is unnecessary to take such a drastic step to allow the appellant in this case to proceed against appellee. The supreme court may simply adopt section 353 of the Restatement Second of Torts which would impose liability only in those cases where the vendor fails to disclose conditions which involve unreasonable risks to persons on the land. Sound public policy requires disclosure in both residential and commercial transactions where such dangerous conditions exist.