RONALD OVERTON *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. KINGSBROOKE DEVELOPMENT, INC., Defendant-Appellant and Cross-Appellee (Landmark Realty, Inc., *et al.*, Defendants).

Fifth District   No. 5—01—0759

Opinion filed April 18, 2003.

Mark C. Goldenberg and Debra J. Meadows, both of Hopkins Goldenberg, P.C., of Edwardsville, for appellant.

Lawrence O. Taliana, of Taliana, Rubin & Buckley, of Edwardsville, for appellees.

JUSTICE CHAPMAN delivered the opinion of the court:

In March of 1996, Ronald and Donna Overton entered into a contract to purchase a lot from Kingsbrooke Development, Inc. (Kingsbrooke). Unbeknownst to the Overtons, Kingsbrooke had placed a large quantity of fill dirt on the lot prior to the sale. After the sale, the Overtons disputed the suitability of the lot and requested their money back. Kingsbrooke denied the request. The Overtons proceeded to file suit and requested attorney fees. Prior to the trial, the claims against Kingsbrooke were severed from the remaining claims. The court then granted a rescission of the contract based on a breach of an "implied warranty of suitability" and awarded damages to the Overtons, but it denied their request for attorney fees. On appeal, Kingsbrooke argues that (1) the court's reliance on the implied warranty of suitability was both contrary to Illinois law and against the manifest weight of the evidence and (2) granting the rescission was an abuse of discretion because it was not supported by either the facts or the law. The Overtons argue that the court erred in not awarding attorney fees under either the language of the contract or the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1996)). We affirm the decisions of the trial court.

## I. BACKGROUND

Kingsbrooke, a corporation in the business of developing residential subdivisions, created Kingsbrooke Subdivision in Glen Carbon, Illinois, and sold lots in that subdivision for residential building. The Overtons purchased lot 38 after viewing this lot with their builder, Gregory Sheahan. They hired Burns Excavating to stake out and excavate. In its initial staking of the house, Burns Excavating made a mistake that was resolved after Kingsbrooke's engineer inspected the property.

When the Overtons began excavating for the basement, they found a large quantity of fill dirt on the lot. The fill dirt was throughout the lot; it contained brick, wood, and other debris and was more than 12 feet deep in some areas. To determine whether the lot in its existing condition was suitable for building, the Overtons hired SCI Engineering—a firm that practices geotechnical environmental engineering, construction services testing, and soil compaction testing. SCI Engineering had previously done work for Kingsbrooke.

Mark Harmes, an engineer with SCI Engineering, was one of the engineers who evaluated the Overtons' lot and testified at the trial. He stated that most residential structures can tolerate an inch or two of settlement. Settlement beyond this increases the risk of structural damage. The prediction for the settlement of fill dirt, Harmes testified, is based on the density level of the soil. Density testing measures the number of soil particles within an amount of space by determining how many pounds of soil there are within a cubic foot. The field density then is stated as a percentage of the maximum laboratory value. Harmes testified that the acceptable engineering compaction standard was a 95% rate, which ensures a settlement of less than an inch. Kingsbrooke, however, presented evidence that the Village of Glen Carbon had approved its subdivision plans setting forth a 90% compaction density rate. Several of the soil samples from the Overtons' lot showed compaction rates lower than 95%, but all relevant rates were greater than 90%.

Harmes had also issued two reports detailing other observations based on the testing of the Overtons' soil. He noted that there was approximately 6 feet of fill dirt in the front portion of the lot and approximately 20 feet in the rear. He also noted that the fill dirt had been placed without engineering supervision and that no compaction tests had been performed. Based on his observations, Harmes concluded that the fill was not compacted properly for the support of the proposed structure. He informed the Overtons that further steps would be necessary before they could construct a residence on that lot.

Harmes proposed two options to achieve a suitable building site. The first option, called an "engineered fill," required that the existing fill dirt be excavated, that foreign debris be removed, and that the dirt be dried and recompacted to a 95% density rate. The second option would be to extend the building's foundation down to virgin soil with piers.

After consulting with their builder, the Overtons decided to attempt an engineered fill. However, the high moisture content of the soil made this option unworkable. The Overtons abandoned the second alternative, piering, after a piering contractor refused the job. At this

point, Sheahan (the builder) withdrew from the project because of concerns about the building site. The Overtons then requested a refund, which Kingsbrooke refused. The Overtons proceeded to sue for a breach of the warranty of habitability, a breach of the implied warranty of fitness for a particular purpose, consumer fraud, and injunctive relief. Additionally, they amended the complaint to include a claim for rescission.

At the trial, David Foreman, who is one of Kingsbrooke's principals and has been in the excavating business for years, stated that he personally did the excavating for the development. He described how he looks at the plans and "cuts and fills" the site according to those plans. The process involves moving dirt from the high places and filling in the low places on the site to get the desired grade. Once the fill dirt is in place, he takes a compactor and runs over it multiple times until he thinks it is sufficiently compacted. Neither Foreman nor anyone else at Kingsbrooke had an engineer do a soil density test to determine whether the fill had been compacted to a density rate that would be suitable for building a residence.

Testimony from Kingsbrooke principals indicated that the firm was aware of the potential problems created by the presence of fill dirt on a construction site. When Foreman was asked what he discloses to buyers about the presence of fill dirt on a lot, he stated, "I don't mention nothing unless they ask me, and I tell them, [']yes there is fill on there.['] " He admitted that when a contractor finds out that a lot contains fill dirt, the contractor normally does something extra to prepare the site for construction. Kingsbrooke admitted that several other homes on adjacent lots, built on fill dirt, required additional foundation support. The subdivision plans for Kingsbrooke were prepared by Sherril & Associates. John Dutton, vice president of Sherril & Associates and the project manager for this Kingsbrooke development, stated that he would not build a house on a fill dirt area, even if it were compacted, unless he could first get to virgin soil. Additionally, he stated that before he made a decision whether to build a residence on a lot, he would want to know if 10 to 12 feet of fill dirt were on it.

The Overtons had no experience in constructing homes. They never asked about whether fill dirt was on the lot, nor did anyone at Kingsbrooke inform them of fill dirt on the lot. No mention was made of the need for piering or other foundation support. Donna Overton testified that she would not have entered into the contract if someone had informed her that piering or recompacting the soil would be necessary in order to build a house on the lot.

The Overtons requested attorney fees under the terms of the sales contract, which Kingsbrooke moved to strike. Prior to the trial, the

claims against Kingsbrooke were severed from the remaining claims. The court then granted a rescission of the contract based on a breach of an "implied warranty of suitability" and awarded damages to the Overtons. The court denied the Overtons' request for attorney fees. Kingsbrooke appeals the grant of the rescission, and the Overtons cross-appeal the denial of attorney fees.

## II. ANALYSIS

### A. Implied Warranty

We first note that the parties assume, and we agree, that despite the trial court's usage of the phrase "implied warranty of suitability," its decision was actually based upon the "implied warranty of habitability." Thus, our analysis proceeds based on the doctrine of an implied warranty of habitability, not suitability.

1. *Development of Implied Warranty of Habitability in Illinois*

We believe that a brief historical overview of the evolution of the implied warranty of habitability is necessary to understand the territory. In the beginning, there was *caveat emptor*. Under the common law theory of "the buyer beware," the buyer often had no protection against defects that his untrained eye could not catch. To avoid the unjust results of *caveat emptor* and merger, the theory of an "implied warranty of habitability" slowly began evolving to protect the buyer under such circumstances.

■ In Illinois, the "implied warranty of habitability" originated in landlord-tenant law and since then has continually been expanded in its application. It was first expanded to the sale of new homes in *Petersen v. Hubschman Construction Co.*, 76 Ill. 2d 31, 389 N.E.2d 1154 (1979). The next year, the court in *Tassan v. United Development Co.*, 88 Ill. App. 3d 581, 587, 410 N.E.2d 902, 909 (1980), held that the warranty applied against a developer/seller for common areas of condominium owners' residences. But in *Kramp v. Showcase Builders*, 97 Ill. App. 3d 17, 422 N.E.2d 958 (1981), the court refused to extend the warranty beyond the builder/seller-buyer relationship, while at the same time holding that the warranty did apply to a defective septic system in a subdivision. Next, in *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 441 N.E.2d 324 (1982), the warranty was extended to a subsequent buyer, who did not have privity with the original developer/builder. In *Briarcliffe West Townhouse Owners Ass'n v. Wiseman Construction Co.*, 118 Ill. App. 3d 163, 454 N.E.2d 363 (1983), the court found that the buyers had specifically relied on the expertise of the builder/seller, and the court expanded the warranty to common land. Soon after that, in *Lehmann v. Arnold*, 137 Ill. App. 3d 412, 484 N.E.2d 473

(1985), the court held that the implied warranty of habitability was not applicable to the sale of an unimproved, vacant lot. In *VonHoldt v. Barba & Barba Construction, Inc.*, 175 Ill. 2d 426, 677 N.E.2d 836 (1997), the court again extended the warranty, this time to subsequent buyers for latent defects in an addition to the home.

In the most recent Illinois Supreme Court decision analyzing the implied warranty of habitability, *Board of Directors of Bloomfield Club Recreation Ass'n v. Hoffman Group, Inc.*, 186 Ill. 2d 419, 712 N.E.2d 330 (1999) (*Bloomfield Club*), the majority refused to apply the warranty to a commonly held clubhouse that contained defects in a residential development because it did not affect the habitability of the individual parties' residences. In two separate dissents, however, three of the justices expressed their strong disagreement with the majority because the opinion failed to follow the rationale of public protection set forth in *Petersen*. Also of interest to the instant case is that the *Bloomfield Club* court distinguished the *Tassan* case (which held that the warranty applies to a developer/seller) on the grounds that in *Tassan*, unlike *Bloomfield Club*, the defects interfered with the habitability of common areas of the condominium residences. *Bloomfield Club*, 186 Ill. 2d at 429, 712 N.E.2d at 336.

Kingsbrooke argues both that (1) the application of an implied warranty of habitability in a case such as this would be contrary to Illinois law and (2) even if the implied warranty could be extended to this situation, the facts of this case do not support a finding of liability.

### 2. Application of Implied Warranty of Habitability

■ We do not view the application of an implied warranty of habitability to this case as contrary to Illinois law. One of the underlying principles in *Petersen* is a concern for buyers who, because their lack of expertise prevents them from determining whether the homes they buy contain latent defects, depend on sellers who do possess the expertise to make those determinations. *Petersen*, 76 Ill. 2d at 40, 389 N.E.2d at 1158. Although we recognize that this case does not involve an existing home, we still believe it to be appropriate for the application of the doctrine since the situation involves the habitability of a prospective home under construction. Further, Illinois courts have already extended the warranty to latent defects in land. See *Briarcliffe West Townhouse Owners Ass'n*, 118 Ill. App. 3d at 167, 454 N.E.2d at 365; see also *Kramp*, 97 Ill. App. 3d at 20, 422 N.E.2d at 960-61 (defects in septic system); *Tassan*, 88 Ill. App. 3d at 584, 410 N.E.2d at 906 (inadequate surface water drainage in the front of the building).

Kingsbrooke relies on the holdings in *Lehmann* and *Kramp* to support its contention that the doctrine of the implied warranty of

habitability is not applicable to this case. In our opinion, the holdings in both *Kramp* and *Lehmann* should be narrowly construed. *Kramp* involved a faulty septic system allegedly caused by inadequate soil conditions. The plaintiffs brought suit against the developer, although the developer was not the party who had sold the land to the plaintiffs. The court held that the *Petersen* rationale would extend the doctrine of the implied warranty of habitability to include defects in septic systems arising from unsuitable soil conditions including subsurface conditions. *Kramp*, 97 Ill. App. 3d at 19, 422 N.E.2d at 960. The court, however, refused to apply the doctrine to the defendant developers. We believe that the crux of the *Kramp* holding derives from the fact that there was no seller-buyer relationship. "In the case at bar the record discloses that no builder-vendor to vendee relationship exists between the defendants and the plaintiffs. Instead it appears that there were several successors in title to the property[,] which was eventually built upon and sold by Showcase Builders, not a party to this appeal, to the plaintiffs." *Kramp*, 97 Ill. App. 3d at 21, 422 N.E.2d at 962. Likewise, *Lehmann* turns on the factual scenario of a sale of unimproved land by the owner to a builder who then sold the land to the plaintiffs. Under those circumstances the court held that it was unfair to hold the original seller accountable under a theory of the warranty of habitability, since the plaintiffs had relied on the expertise of the builder rather than the expertise of the original seller of the land. *Lehmann*, 137 Ill. App. 3d at 417, 484 N.E.2d at 477. We do not find either *Kramp* or *Lehmann* controlling for our decision in this case. In the present case there is no issue of accountability without dependency: Kingsbrooke is both the one who made improvements to the lot—which the Overtons contend amount to latent defects—and the one who sold the lot directly to the Overtons. The court in *Tassan* reasoned that it was equitable to hold the developer/seller liable under the warranty when the same dependency relationship existed in *Tassan* and *Petersen*—in *Tassan* between the developer/seller and the buyer and in *Petersen* between the builder/seller and the buyer. *Tassan*, 88 Ill. App. 3d at 588, 410 N.E.2d at 908.

We, too, believe that the same public policy concerns apply for the protection of a buyer from a developer/seller as those that apply for the protection provided to buyers in *Petersen* and its progeny. We therefore hold that a buyer has a cause of action for a breach of an implied warranty of habitability against a developer/seller for latent defects in improved land.

### 3. *Factual Liability*

■ Alternatively, Kingsbrooke argues that if an implied warranty

of habitability is applicable to this case, the facts do not support liability. Kingsbrooke claims that it merely sold the Overtons a vacant lot and had no control over the construction on that lot. We do not agree with Kingsbrooke's claim that lot 38 was just a vacant lot. Kingsbrooke had significantly changed the lot by hauling in and moving dirt to fill in and level the low places. Kingsbrooke had literally designed and fashioned the topography of the lot, presumably for the sole purpose of creating sales. These actions taken by Kingsbrooke altered the natural state of the lot and clearly qualify as improvements. See *Briarcliffe West Townhouse Owners Ass'n*, 118 Ill. App. 3d at 166, 454 N.E.2d at 365.

Kingsbrooke asserts that there is no support for the trial court's conclusion that the need for additional foundation support is a latent defect. Kingsbrooke argues that the lot was sold for the construction of a residence and that it was suitable for that purpose.

The developer impliedly warranted that the lot was suitable for normal residential construction. The Overtons' expert testified that there was a need for additional foundation support, which is not considered normal construction. John Dutton, vice president of Sherril & Associates and project manager for this Kingsbrooke development, stated that he would not build a home on fill dirt unless he could first reach virgin soil. Even though the Overtons visually inspected the lot before purchasing it, it was not possible to know the extent of the fill dirt by a visual inspection. "A latent defect has been defined as one which, in the circumstances of the case, could not have been discovered by the exercise of ordinary and reasonable care." *Tassan*, 88 Ill. App. 3d at 590, 410 N.E.2d at 910. The Overtons were just ordinary people with no expertise in home building; they had no reason to know or expect that there was a substantial amount of fill dirt on the lot. Kingsbrooke, of course, had the information but chose not to reveal it to the buyers. Had Kingsbrooke disclosed the amount of fill dirt, the Overtons would have had no claim that there was a latent defect. The amount of the fill dirt is what made it necessary to employ additional foundation support to reach virgin soil. We agree with the trial court's determination that the amount of fill dirt was a latent defect in the property.

## B. Rescission

■ Rescission is an equitable remedy that may be appropriate when there has been a breach of the implied warranty of habitability. See *Finke v. Woodard*, 122 Ill. App. 3d 911, 462 N.E.2d 13 (1984). Kingsbrooke argues that the trial court abused its discretion in granting a rescission in this case because (1) the Overtons cannot claim

that a mistake was made despite the exercise of reasonable care, (2) it is impossible to place the parties in status quo *ante*, and (3) the Overtons cannot show that a substantial nonperformance or a substantial breach occurred.

### 1. *Reasonable Care*

■ We disagree with Kingsbrooke's reliance on *People ex rel. Department of Public Works & Buildings v. South East National Bank of Chicago*, 131 Ill. App. 2d 238, 266 N.E.2d 778 (1971), in support of its contention that the rescission was improper because the Overtons failed to prove that a mistake had occurred despite the exercise of reasonable care. *South East National Bank of Chicago* was decided before *Petersen* and is not an implied-warranty-of-habitability case. For a rescission, *Petersen* and its progeny do not require proof that a mistake occurred. Under the implied-warranty-of-habitability theory, "reasonable care" is a question of fact that relates to the determination of whether a defect is patent or latent. The latter is one that could not have been discovered by reasonable care. *Tassan*, 88 Ill. App. 3d at 590, 410 N.E.2d at 910. It seems clear to us that the Overtons did exercise reasonable care. Before purchasing the lot, they went with their builder, Sheahan, and inspected it. Both the Overtons and Sheahan testified that they did not know there was fill dirt on the lot. The Overtons had no expertise in these matters. Even if we assume that the Overtons had reason to believe that there was some fill dirt on the lot, it was not the mere presence of fill dirt that the court found to be a defect. It was the amount of the fill dirt (up to 20 feet in some locations) that could not be determined from a visual inspection.

### 2. *Return to Status Quo*

The trial court specifically addressed the issue of the difficulty of returning the parties to their positions prior to the contract. The court stated that if attaining status quo *ante* is impossible in this situation, it was an impossibility caused by Kingsbrooke. We agree. Kingsbrooke practiced a "don't ask, don't tell" sales approach. This was a risk that Kingsbrooke willingly undertook. The court also noted that it did not believe that the Overtons lost their right to a rescission because of any additional excavating they had done on the property because money damages could remedy any damage to the property caused by the excavating. The court offset the $57,741.09 award to the Overtons by $2,000 to allow for any expense Kingsbrooke might incur in rehabilitating the lot. We find that the court adequately restored the defendant to the status quo. See *Hakala v. Illinois Dodge City Corp.*, 64 Ill. App. 3d 114, 121, 380 N.E.2d 1177, 1182 (1978).

### 3. *Material Breach*

Lastly, we believe that this was a substantial breach. Almost every witness that testified, including those for Kingsbrooke, stated that they would want to know the amount of fill dirt on a lot before deciding whether to buy it. Donna Overton testified that she would not have entered into the contract if she had known the extent of the fill dirt. Harmes testified that unless something further was done to improve the condition of the soil, the home, once constructed, would be at risk for settlement and that settlement beyond one to two inches could cause structural damage. Kingsbrooke's own project manager, John Dutton, stated that he would not build on fill dirt unless he could get to virgin soil. Because of Kingsbrooke's failure to disclose the fill dirt, the Overtons were denied the ability to make an informed decision on whether they wanted to undertake the risk of future structural damage to their home or if they wanted to undertake the additional expense to prevent future problems. We rely strongly on the public protectionist policy in finding that this was a substantial breach because of the importance of the purchase involved and the fact that the contract would not have been entered into if the extent of the fill dirt had been disclosed. See *Felde v. Chrysler Credit Corp.*, 219 Ill. App. 3d 530, 580 N.E.2d 191 (1991). A house is the biggest, most important purchase that many people make in their lifetimes. While this case involves the property rather than the house itself, a house is only as solid as its foundation.

### C. Attorney Fees

The Overtons argue that they should have been awarded attorney fees in this case pursuant to (1) the language of the contract and (2) the Consumer Fraud and Deceptive Business Practices Act.

### 1. *The Contract*

■ The contract provided: "The failure of either party to comply with the terms of this contract (including unreasonably withholding release of earnest money) will obligate that party to pay all damages, reasonable attorney's fees[,] and expenses incurred by the other party because of that failure." Kingsbrooke filed a motion to strike the portion of the complaint asking for attorney fees pursuant to the contract because it had complied with the contract in selling the lot. The court allowed the motion to strike.

If a contract provides for awarding attorney fees, generally courts will enforce such a provision. The Overtons argue that Kingsbrooke's contractual obligation was to sell a residential lot to them. They claim that because Kingsbrooke did not convey a lot which was suitable to build a home on, it failed to comply with the terms of the contract. As

a result, they continue, the trial court erred in allowing Kingsbrooke's motion to strike. Kingsbrooke counters that the Overtons brought their suit under a breach-of-implied-warranty-of-habitability theory, not a breach-of-contract theory, and that Kingsbrooke satisfied the terms of the contract by conveying the deed to the property to the Overtons.

We agree with Kingsbrooke that the Overtons are not entitled to attorney fees, but we disagree on the reason. The recovery of attorney fees is an inconsistent remedy in an action for the rescission of contract. The remedy of rescission necessitates disaffirming the contract to allow the parties to return to the status quo. *Puskar v. Hughes*, 179 Ill. App. 3d 522, 528, 533 N.E.2d 962, 966 (1989). A party must elect a remedy based on the affirmance or disaffirmance of the contract, but the election of one is the abandonment of the other. *Newton v. Aitken*, 260 Ill. App. 3d 717, 720, 633 N.E.2d 213, 217 (1994). In rescission, generally each party is required to return to the other the value of the benefits received under the contract. *Newton*, 260 Ill. App. 3d at 720, 633 N.E.2d at 216. Additionally, the plaintiff's attorney fees are not a benefit conferred upon the defendant and thus are not appropriate for restitution.

### 2. *The Consumer Fraud and Deceptive Business Practices Act*

■ Alternatively, the Overtons argue that the trial court abused its discretion in failing to award attorney fees under the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1996)). Trial courts may award reasonable attorney fees and court costs to the prevailing party in an action for actual damages arising from violations of the Consumer Fraud and Deceptive Business Practices Act. 815 ILCS 505/10a(c) (West 1996). The trial court made no express finding of any violations of that act. Thus, the Overtons, despite prevailing on their implied-warranty-of-habitability claim, were not the prevailing party on their Consumer Fraud and Deceptive Business Practices Act claim. Consequently, they could not recover attorney fees. We conclude that the trial court properly denied the Overtons' request for attorney fees.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court granting the rescission of the contract and awarding damages to the Overtons based on Kingsbrooke's breach of the implied warranty of habitability. We also affirm the court's decision denying attorney fees.

Affirmed.

WELCH and DONOVAN, JJ., concur.