# IN THE SUPREME COURT OF IOWA

No. 13–1285

Filed December 12, 2014

**ROSAUER CORPORATION,**

Appellant,

vs.

**SAPP DEVELOPMENT, L.L.C.; TODD SAPP; WHISPERING CREEK, L.L.C.;** and **W.C. DEVELOPMENT, INC.,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, Duane E. Hoffmeyer, Judge.

Residential developer seeks further review of court of appeals decision affirming summary judgment that dismissed claim implied warranty of workmanlike construction applied to sale of building lot without a dwelling. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Paul D. Lundberg of Lundberg Law Firm, P.L.C., Sioux City, for appellant.

Patrick L. Sealy and John C. Markham of Heidman Law Firm, L.L.P., Sioux City, for appellees.

**WATERMAN, Justice.**

In this appeal, we must decide whether to extend the implied warranty of workmanlike construction to the sale of a residential lot without a home or other structure. The plaintiff, a contractor-developer, bought the lot from a realtor to build townhomes for sale. He alleges the lot had improperly compacted backfill, requiring extensive additional work to get it ready for construction. Plaintiff sued the original developers whose contractor had performed the substandard soil work. The district court granted defendants' motion for summary judgment, ruling that the implied warranty did not apply to the sale of a lot without a dwelling. The court of appeals affirmed, appropriately deferring to our court whether to extend the implied warranty to this scenario. We granted further review.

We now join the majority of courts reaching this question and hold the implied warranty of workmanlike construction does not apply to the sale of a lot with no dwelling. As explained below, the implied warranty was judicially created to protect residents from substandard living conditions. The purpose of the implied warranty is to redress the disparity in expertise and bargaining power between consumers and builder-vendors in recognition of the difficulty of discovering latent defects in complex modern residential structures. We decline to extend the implied warranty to the sale of land between developers able to protect themselves through express contract terms and simple soil tests.[1] Accordingly, we affirm the decision of the court of appeals and the judgment of the district court.

---

[1]In *Luana Savings Bank v. Pro-Build Holdings, Inc.*, decided today, we decline to extend the implied warranty to allow claims by a foreclosing lender that acquired the buildings by deed in lieu of foreclosure. ___ N.W.2d ___, ___ (Iowa 2014).

## I. Background Facts and Proceedings.

Defendants, Todd Sapp and his company, W.C. Development, L.L.C., developed a large residential subdivision, Royal Highland, out of farmland on the southeast side of Sioux City, Iowa. W.C. Development hired an engineer to prepare a topographical map, perform soil testing, and create a plat. At the center of this dispute is lot 13 of the third addition. The actual grading, backfilling, and compaction of lot 13 was performed by Burkhardt Construction, hired by W.C. Development. W.C. Development also hired Certified Testing Services (CTS) to ensure that the fill and soil compaction were done correctly. In April 2003, W.C. Development sold lot 13 to Kenneth Beaulieu, a realtor.

Plaintiff, Rosauer Corporation, owned by Anthony Rosauer, is a home building and landscaping corporation doing business since 1997. Rosauer purchased lot 13 from Beaulieu for $50,000 on July 24, 2007. It was Rosauer's first purchase of a residential building lot. The lot was subject to restrictive covenants, and Rosauer planned to build two townhomes for sale. Before he purchased lot 13, Rosauer heard rumors that homes in the development were settling due to soil compaction problems. Rosauer nevertheless failed to request any soil tests on lot 13 before he bought it. After the sale was final, Rosauer's lender required soil testing on the lot, which revealed undocumented fill with inconsistent moisture levels. CTS recommended complete removal and replacement of existing fill material before building on lot 13. Rosauer telephoned Sapp to discuss the CTS report. During this phone call, Sapp told Rosauer that the problem had happened on several other lots, and W.C. Development had paid extra costs associated with soil work for those lots. They had no further discussions before this litigation commenced. Rosauer spent $76,858 to comply with the CTS

recommendations, with $69,995 of the work completed by his own landscaping company.

Rosauer ultimately built two townhomes on lot 13 and continued to buy other lots in the same development. As he purchased additional lots, Rosauer requested soil testing, but the lot owners refused, asserting liability concerns. Rosauer then negotiated contractual provisions that allowed the option of rescission of those purchases based on postsale soil testing.

In June 2012, Rosauer filed this lawsuit to recover the costs of the soil work on lot 13, naming Sapp and W.C. Development as defendants on theories of negligence and breach of implied warranty. Sapp moved for summary judgment, alleging that Rosauer's economic losses were not recoverable in tort and that Iowa courts had not recognized a claim for implied warranties in the sale of unimproved land. Rosauer conceded that the economic loss doctrine precluded recovery in negligence,[2] but resisted summary judgment on his implied warranty claims. The district court granted summary judgment for Sapp, reasoning that the land was an unimproved lot lacking a dwelling, and therefore the implied warranty of workmanlike construction did not apply. Rosauer appealed, and we transferred the case to the court of appeals. The court of appeals affirmed, declining to extend the implied warranty to land without a dwelling. We granted further review to decide whether to extend the implied warranty of workmanlike construction to these facts.

## II. Standard of Review.

We review rulings that grant summary judgment for correction of errors at law. *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 542 (Iowa

---

[2]The economic loss doctrine is not at issue in this appeal.

2006). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3). We view the evidence in the light most favorable to the nonmoving party. *Parish,* 719 N.W.2d at 543.

### III. Analysis.

We must decide whether to extend the implied warranty of workmanlike construction to the sale of land without a dwelling. This is a question of first impression in Iowa. We begin our analysis with a review of the history of the implied warranty of workmanlike construction in our state and the policies underlying that doctrine. Then we examine the elements of the implied warranty as applied to the sale of a lot. Next, we determine whether the underlying policies support extending the doctrine to these facts. Finally, we examine cases from other jurisdictions adjudicating whether to allow implied warranty claims on the sale of lots without dwellings. We conclude the doctrine should not be extended to the sale of lots between developers.

**A. The Implied Warranty of Workmanlike Construction in Iowa.** Iowa has long recognized in construction contracts an implied warranty that a building " 'will be erected in a reasonably good and workmanlike manner' " and that it " 'will be reasonably fit for the intended purpose.' " *See Busker v. Sokolowski,* 203 N.W.2d 301, 303 (Iowa 1972) (quoting *Markman v. Hoefer,* 252 Iowa 118, 123, 106 N.W.2d 59, 62 (1960) (discussing the implied warranty found in construction contracts)); *see also Smith & Nelson v. Bristol,* 33 Iowa 24, 25 (1871) (stating the rule that in a construction contract that did not express a specific manner in which work was to be done, the work "was to be done in a workmanlike manner"). This warranty, however, was not initially recognized in residential construction.

In *Mease v. Fox*, we recognized an implied warranty of habitability in a residential lease.[3]  200 N.W.2d 791, 793–95 (Iowa 1972) (describing the retreat from the common law of caveat emptor in leases and the growing trend of implying a warranty of habitability).  *Mease* emphasized that changing housing conditions gave a tenant far less bargaining power than landlords.  *Id.* at 794 (describing a tenant's inability to know about potential housing law violations or deficiencies on the premises).

We did not adopt the implied warranty of workmanlike construction in the sale of residential real estate until our decision in *Kirk v. Ridgway*.  *See* 373 N.W.2d 491, 493–94, 496 (Iowa 1985) (explaining that there had been no prior implied warranties in Iowa residential real estate contracts).  "Traditionally, the common law presumed the home buyer was on the same footing as the seller because he or she could inspect the property and negotiate accordingly. Therefore, each side should live with the bargain."  Dee Pridgen, *Consumer Protection and the Law* § 18:2, at 18-3 (2002).  After World War II, sales of premade homes that builder-vendors mass-marketed to consumers increased dramatically, and purchasers complained of shoddy construction.  *Id.* § 18:2, at 18-4.  Because of the harshness of the common law, courts began to recognize implied warranties in the sale of a home for the protection of innocent consumers.  *See Kirk*, 373 N.W.2d at 493.

In *Kirk*, we adopted an implied warranty of workmanlike construction in the sale of new homes by a builder-vendor.  *See id.* at 496.  Kirk had purchased a new home from Ridgeway, a contractor who

---

[3]The common law implied warranty of habitability adopted in *Mease* to protect tenants has been codified by the Uniform Residential Landlord and Tenant Act, Iowa Code chapter 562A.  *See Crawford v. Yotty*, 828 N.W.2d 295, 299 (Iowa 2013).

built and owned the home. *Id.* at 492. After purchasing the home, Kirk discovered peeling paint resulting from defective construction and brought an action for breach of an implied warranty. *Id.* The district court found that Ridgeway had breached the implied warranty of workmanlike construction, and on appeal we addressed the situation in which "a prospective homeowner does not hire the builder to build the house but buys one from him already built." *Id.* at 492–93.

In *Kirk,* we gave three reasons for adopting the implied warranty of workmanlike construction in the sale of a new home. *Id.* at 493–94. First, we noted the change in house-construction techniques "from single-unit construction under the supervision of the owner, to the tract development commonly found today." *Id.* at 493. Second, we noted the increasing interest other courts had taken in consumer protection in real estate transactions. *Id.* Finally, we pointed out the increasing complexity of home construction makes it more difficult for the buyer to discover latent defects, requiring a buyer to rely on the skill and judgment of the builder. *Id.* at 494. We concluded that the adoption of the implied warranty was a "logical extension of *Mease,*" protecting the innocent purchaser of a home who must rely on the skill of another for the basic condition of their habitation. *Id.* at 496. In *Kirk* we adopted the following "generally recognized" elements for the newly adopted implied warranty:

> (1) That the house was constructed to be occupied by the warrantee as a home;
>
> (2) that the house was purchased from a builder-vendor, who had constructed it for the purpose of sale;
>
> (3) that when sold, the house was not reasonably fit for its intended purpose or had not been constructed in a good and workmanlike manner;

(4) that, at the time of purchase, the buyer was unaware of the defect and had no reasonable means of discovering it; and

(5) that by reason of the defective condition the buyer suffered damages.

*Id.*

We revisited the second element in *Flom v. Stahly*, 569 N.W.2d 135, 142 (Iowa 1997). In that case, the Stahlys began construction of a home on land they owned, intending to live in it themselves. *Id.* at 137. Before completing construction, the Stahly family moved out of state and sold the incomplete home to the Floms. *Id.* at 137–38. When wood in the home began to rot, the Floms sued under several theories, including breach of implied warranty of workmanlike construction. *Id.* at 138–39. We rejected this extension of *Kirk* because the Stahlys did not meet the second element of the *Kirk* test—they were not builder-vendors building a home for the purpose of sale. *Id.* at 142. Because the Stahlys had intended to live in the house themselves and had never built a home for resale before, the Stahlys did not have the same unequal relationship with the Floms that a builder-vendor would have with a homebuyer.

We extended the implied warranty to subsequent purchasers of homes in *Speight v. Walters Development Co.*, 744 N.W.2d 108, 116 (Iowa 2008). Again, we emphasized the inequality in bargaining power between a homebuyer and a builder-vendor, due to "the buyer's lack of expertise in quality home construction and the fact that many defects in construction are latent. These defects, even if the home were inspected by a professional, would not be discoverable." *Id.* at 111. In choosing to extend the implied warranty to subsequent purchasers, we noted its purpose "is to ensure the home will be fit for habitation, a matter that depends upon the quality of the dwelling delivered not the [privity] status

of the buyer." *Id.* at 113 (internal quotation marks omitted). As in *Kirk*, we were influenced by both the modern trend of the law in other jurisdictions and changes in society. *See id.* at 113–14 (surveying other jurisdictions that had adopted extensions similar to *Speight* and noting that society is increasingly mobile, with more frequent resales of newer homes).

The primary purpose behind the implied warranty of workmanlike construction adopted in *Kirk* is the protection of consumers. *See* 373 N.W.2d at 494. Defects in home construction in stairways, heating and cooling systems, or a defective wall or ceiling pose a risk of serious injury. *Id.* The costs to remedy such defects " 'should be borne by the responsible developer who created the danger . . . rather than by the injured party who justifiably relied on the developer's skill and implied representation.' " *Id.* at 494 (quoting *Schipper v. Levitt & Sons, Inc.*, 207 A.2d 314, 326 (N.J. 1965)). In *Speight*, we again emphasized the significance of the actual habitation of the home. *See* 744 N.W.2d at 113. We have yet to extend the implied warranty beyond its purpose of protecting consumers actually living in defectively built housing.

**B. The Elements of *Kirk*'s Implied Warranty as Applied to the Sale of a Lot With No Dwelling.** Rosauer admittedly cannot satisfy the first three elements of the *Kirk* test for the simple reason there was no house or dwelling constructed or sold by the defendants. We briefly address each element in turn.

1. *The requirement that the house was constructed to be occupied by the warrantee as a home.* The first element limits the potential class of plaintiffs to innocent homebuyers for whose benefit we created the warranty. In this case, Rosauer purchased a vacant lot on which to build townhomes to sell, rather than to build his own residence.

Rosauer thus is not within the class of persons that the implied warranty was designed to protect. *See Kirk,* 373 N.W.2d at 496–97; *see also Speight,* 744 N.W.2d at 111 (noting "home buyers are ill-equipped to discover defects in homes, which are increasingly complex, and therefore must rely on the skill and judgment of the vendor"); *Cook v. Salishan Props., Inc.,* 569 P.2d 1033, 1035 (Or. 1977) (en banc) ("[P]laintiffs have not convinced us that purchasers of developed but unimproved land, as a class, need the additional protection of the application of warranty . . . ."). As our court of appeals observed, "Rosauer is not the kind of naïve purchaser the implied warranty normally works to protect. As a commercial investor, Rosauer would have more skills than the average consumer to determine if the lot was suitable for building." We agree.

2. *The requirement that the house was purchased from a builder-vendor, who had constructed it for the purpose of sale.* Just as the first element limits the class of potential plaintiffs, the second element limits the class of potential defendants to a builder-vendor doing construction for the purpose of sale. In *Kirk,* we adopted the following definition for the term "builder-vendor":

> "[A] person who is in the business of building or assembling homes designed for dwelling purposes upon land owned by him, and who then sells the houses, either after they are completed or during the course of their construction, together with the tracts of land upon which they are situated, to members of the buying public.
>
> The term 'builder' denotes a general building contractor who controls and directs the construction of a building, has ultimate responsibility for a completion of the whole contract and for putting the structure into permanent form thus, necessarily excluding merchants, material men, artisans, laborers, subcontractors, and employees of a general contractor."

373 N.W.2d at 496 (quoting *Jeanguneat v. Jackie Hames Constr. Co.,* 576 P.2d 761, 762 n.1 (Okla. 1978)). Other jurisdictions have adopted

essentially the same definition. *See Elderkin v. Gaster*, 288 A.2d 771, 774 n.10 (Pa. 1972) ("A builder-vendor . . . refers to one who buys land and builds homes upon that land for purposes of sale to the general public."); *Frickel v. Sunnyside Enters., Inc.*, 725 P.2d 422, 424–25 (Wash. 1986) (en banc); *Bagnowski v. Preway, Inc.*, 405 N.W.2d 746, 750 (Wis. Ct. App. 1987).

When no dwelling has been constructed at the time of the sale of property, we do not have a builder-vendor, only a vendor. It is true that defendants W.C. Development and Sapp acquired the land for sale and, through a subcontractor, graded and backfilled the lot in preparation for its sale. However, the defendants constructed no home on the lot and sold only the land without any dwelling. The definition we adopted in *Kirk* and reaffirmed in *Flom* is clear—a builder-vendor must construct a home on land it owns for purposes of sale to the public. In this case, the defendants are land developers, not builder-vendors. Indeed, Rosauer is the builder-vendor of the townhomes he built on this lot. Rosauer cannot meet the second element requiring proof the defendant is a builder-vendor.

3. *The requirement that the house was unfit for its intended purpose or defectively built.* Rosauer also cannot satisfy the third element of the *Kirk* test because there was no house sold by defendant that was defectively built or unfit for its intended purpose. *See Kirk* at 496. Builders generally sell homes they hold out " 'to the public as fit for use as a residence, and of being of reasonable quality.' " *Id.* at 494 (quoting *Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795, 798 (Mo. 1972) (en banc)).

This case, however, involves more than a sale of raw land. Rather, the lot at issue was graded, backfilled, and compacted by defendants'

subcontractor. The evidence supports a finding that the work was substandard, requiring costly additional soil work by Rosauer. We will now examine the policies underlying Iowa's implied warranty doctrine to decide whether it should be extended to the sale of a lot without a dwelling.

**C. The Public Policies Underlying the Implied Warranty of Workmanlike Construction.** In *Kirk*, we identified several reasons to extend an implied warranty to new homeowners: changes in construction techniques, a growing consensus in other jurisdictions that implied warranties should extend to protect consumer-homeowners, the increasing complexity of homes, and our concern for the safety and living standards of persons inhabiting new houses. *Kirk*, 373 N.W.2d at 493–96. None of these concerns apply with the same force to a developer's purchase of land without a dwelling. First, as discussed below, the majority of jurisdictions have declined to extend the implied warranty to the sale of land with no dwelling. Second, while many features a homebuyer would need to inspect in order to make an informed decision are hidden behind walls or inaccessible without costly and destructive testing, land is easily inspected before purchase. *See Cook*, 569 P.2d at 1035 ("Land is accessible for inspection before it is purchased."). Rosauer argues that the defect in the land was latent because it was below the surface, but a routine, nondestructive soil test revealed the fill issues in lot 13. While modern homes involve complex construction techniques, land that has been graded and backfilled is comparatively simple to inspect. *See id.*

Third, homes are built as a final product for habitation. A homebuyer relies on the expertise of the builder. *Kirk*, 373 N.W.2d at 494. The safety and health of the buyers is at stake as soon as they

enter into the home. *Id.* at 493 ("[T]he courts which have given relief to the purchaser of a new house . . . put their theory of recovery on the breach of an implied warranty of fitness for human habitation . . . ." (internal quotation marks omitted)). By contrast, the developer purchasing land without a dwelling is not relying on the seller to construct habitable housing. Instead, the purchasing developer has the responsibility to take all the steps necessary to construct a safe dwelling on the lot, using its own expertise.

Finally, the overriding policy of our decision in *Kirk* was the protection of innocent homeowners who lacked sophistication and bargaining power to protect themselves. *See* 373 N.W.2d at 494. As a class, for-profit developers in the business of construction are not in need of judicially imposed implied warranties to redress disparities in expertise or bargaining power. Rather, the developer can protect itself through inspections and express contract provisions. Rosauer argues he should not be considered a sophisticated developer because this is the first residential construction lot that he purchased. Alternatively, he argues that the sophistication of the purchaser should not be determinative when workmanship is faulty. However, the record shows that Rosauer has been in the landscaping and construction business since 1997 and owned a business capable of doing the majority of the soil work. He had substantially more sophistication and knowledge of construction, fill, and grading than an average homebuyer. Rosauer concedes there was no disparity in bargaining power with Beaulieu at the time of the lot purchase. Indeed, Beaulieu agreed to float the land to Rosauer without requiring payment up front. Rosauer's own experience acquiring subsequent lots shows how developers can protect their interests contractually. Rosauer purchased the additional lots subject to

express contract terms he negotiated that allowed rescission if the soil sample taken after purchase was unsatisfactory.

Homebuyers are a class apart from developers such as Rosauer. Iowa's existing implied warranty of workmanlike construction protects consumers buying their own residences. Homeowners are seeking the basic necessity of shelter, often with a time limit imposed by career or family demands. *Conklin v. Hurley*, 428 So. 2d 654, 659 (Fla. 1983). For many persons, the home is the largest investment they will ever make, involving a major percentage of their income and savings. *Id.* Substandard construction of their homes may lead to health hazards or financial ruin. *Id.* We do not see the same reasons to protect developers speculating in real estate for profit. "Those who speculate in land, as a class, simply do not need the sort of protection [offered by an implied warranty]." *Id.* An investor or developer risks a financial setback, but does so with the hope and expectation of gain. If the land is not as fit as the investor or developer hoped for construction, it may prove to be a bad risk, but is unlikely to be catastrophic for the developer. *Id.* We conclude that unlike homeowners, for-profit developers do not require the protection of a judicially imposed implied warranty of workmanlike construction.

**D. Caselaw in Other Jurisdictions on the Applicability of Implied Warranties for the Sale of Lots Without Dwellings.** In both *Kirk* and *Speight,* we looked to caselaw from other jurisdictions for guidance to determine national trends in the scope of implied warranties of workmanlike construction. We do so again today.

A majority of courts to address the question decline to extend the implied warranty of workmanlike construction to the sale of lots with no dwelling. *See, e.g., DeAravjo v. Walker*, 589 So. 2d 1292, 1293 (Ala.

1991) (applying the doctrine of caveat emptor to the purchase of unimproved land); *Conklin*, 428 So. 2d at 658 (recognizing a distinction between modern home-buying practices and traditional real estate sales of land, and concluding that land with a defective seawall was "essentially an empty lot" that did not carry an implied warranty); *Lehmann v. Arnold*, 484 N.E.2d 473, 477 (Ill. App. Ct. 1985) (concluding "it would be unfair to impose a warranty of habitability on the seller of unimproved land for a house that has not yet been built"); *San Luis Trails Ass'n v. E.M. Harris Bldg. Co.*, 706 S.W.2d 65, 69 (Mo. Ct. App. 1986) ("Plaintiff here has not alleged deterioration of a house . . . and cannot recover damages based on implied warranty."); *Cook*, 569 P.2d at 1035 ("[W]hile it is true that the ordinary purchaser of subdivided land relies . . . on the expertise of the developer, the degree of the purchaser's necessary reliance is not as great as that of the purchaser of a home."); *Jackson v. River Pines, Inc.*, 274 S.E.2d 912, 913 (S.C. 1981) (declining to extend the implied warranty to the sale of land for construction).

Rosauer argues that, while lot 13 did not have a structure when he purchased it, it had been backfilled and compacted. Further, the land was subject to restrictive covenants limiting new construction to residences. Therefore, Rosauer claims, the land was not raw but instead developed and marketed as a buildable lot, and his expectation that it would be buildable should be backed by an implied warranty. What is significant for our purposes is that lot 13 was sold without a dwelling. In any event, other courts have rejected the argument that work preparing lots for new construction or restrictive covenants give rise to the implied warranty of workmanlike construction on the sale of a lot without a dwelling. *See Morris v. Strickling*, 579 So. 2d 609, 610–11 (Ala. 1991) (concluding that a seller who constructed curbs, gutters, drainage

ditches, and sewers in a development still sold unimproved land where there was no building upon the lot); *Cook*, 569 P.2d at 1034 (declining to extend the warranty to the sale of land subject to a residential restrictive covenant); *Jackson*, 274 S.E.2d at 912–13 (concluding that restrictive covenants on the land did not require extension of implied warranty).

A few courts have extended implied warranties to improved lots without a dwelling. In *Rusch v. Lincoln–Devore Testing Laboratory, Inc.*, the court awarded relief to a purchaser for defective fill in a building lot. 698 P.2d 832, 835 (Colo. App. 1984). However, the holding was narrowly limited to proof of actual reliance. *Id.* (holding that "if [a] vendor has reason to know that the purchaser is relying upon the skill or expertise of the vendor in improving the parcel . . . , and the purchaser does in fact so rely, there is an implied warranty"). Another court gave relief under similar facts through the contractual doctrine of mutual mistake. *See Hinson v. Jefferson*, 215 S.E.2d 102, 110–11 (N.C. 1975). The *Hinson* court relied on a finding that a reasonable inspection would not have disclosed the defect in that case. *Id.* at 111. By contrast, Rosauer could have discovered the fill problems with a simple soil test and in fact did so after his purchase.

Two other appellate courts have adopted an implied warranty in sale of building lots without a dwelling when the purchaser was closer to our description in *Kirk* of an innocent homebuyer. *See Overton v. Kingsbrooke Dev., Inc.*, 788 N.E.2d 1212, 1218 (Ill. App. Ct. 2003) ("We, too, believe that the same public policy concerns apply for the protection of a buyer from a developer/seller as those that apply for the protection provided to buyers in [cases similar to *Kirk*]."); *Jordan v. Talaga*, 532 N.E.2d 1174, 1185–86 (Ind. Ct. App. 1989) (concluding that developers who graded lots were in the best position to decide suitability). In

*Jordan*, the defendant platted and graded the lot, sold it to a second developer who built a home, which was then sold to the plaintiff-homebuyer.  532 N.E.2d at 1178.  The court determined, based on the experience and sophistication of the initial developers, that they should have discovered the latent drainage defects in the lot and never sold it as buildable.  *Id.* at 1185–86.  Similarly, in *Overton*, the plaintiffs were relatively unsophisticated consumers who bought the lot in order to hire a contractor to build their residence there.  788 N.E.2d at 1214.  These cases are distinguishable in that the plaintiffs were unsophisticated homeowners, not developers like Rosauer.

Our survey shows the caselaw extending the implied warranty to the sale of lots is sparse.  The weight of authority nationally limits the implied warranty of workmanlike construction to the sale of homes already built.  We join the majority of courts to hold that the implied warranty of workmanlike construction in our state does not extend to a developer's purchase of a lot without a dwelling.

**IV.  Disposition.**

For these reasons, we decline to extend the implied warranty of workmanlike construction to a for-profit developer's purchase of a lot with no dwelling, regardless of the work performed by the seller to make the lot buildable.  We therefore affirm the decision of the court of appeals and the district court's summary judgment in favor of defendants.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Wiggins and Appel, JJ., who concur specially, and Hecht, J., who takes no part.

**WIGGINS**, **Justice (concurring specially).**

The rationale behind the implied warranty of workmanlike construction is to ensure a dwelling "will be fit for habitation." *Speight v. Walters Dev. Co.*, 744 N.W.2d 108, 113 (Iowa 2008) (internal quotation marks omitted). The rationale behind the warranty does not apply to land that does not include a structure designed for human habitation. It is for this reason, I concur in the result only.

Appel, J., joins this special concurrence.